In the Matter of the ADOPTION OF
BABY BOY D, a minor child.

No. 62024.

Supreme Court of Oklahoma.

Nov. 12, 1985.

Rehearing Denied Sept. 16, 1987.

Susan Work Haney, Gary Taylor, Oklahoma City, for appellant.

William Buxton, Leach, Sullivan, Green & Buxton, Duncan, Rex K. Travis, Oklahoma City, J. Michael Viscosi, Duncan, for appellees.

SUMMERS, Justice.

Appellant was a 19 year old member of the Seminole Nation of Oklahoma when his former girlfriend, an unmarried 17 year old non-Indian, gave birth to Baby Boy D. With her consent the infant was adopted by the appellees, a married couple. After learning of the adoption without notice to him and without his consent, he filed a petition in the District Court, claiming to be the father and seeking to vacate the adoption.

Appellant's Petition to Vacate requested that the Decree of Adoption be set aside on the grounds that (1) Baby Boy D was an Indian child as defined by the Indian Child Welfare Act [1] (ICWA), and that the adoption proceedings are subject to invalidation thereby [2] (2) that the appellant was denied due process, that is to say, notice and the opportunity to be heard, and (3) the Decree was subject to being vacated on the grounds of fraud practiced on the court by the natural mother. He also sought custody of the child.

The trial court found (1) that the appellant lacked standing to urge the vacation of the Decree of Adoption, (2) that the ICWA was not applicable, and (3) that no relationship existed between the appellant and Baby Boy D which would give rise to standing predicated on constitutional principles, citing *Lehr v. Robertson,*[3] *Caban v. Mohammed,*[4] and *Quilloin v. Walcott.*[5] The trial court sustained the special appearance, objection to the jurisdiction of

---

1. 25 U.S.C. §§ 1901–1963, 1914.

2. 25 U.S.C. § 1914.

3. 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983).

4. 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979).

5. 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978).

the court and motion to quash of the appellee adoptive parents and the Petition to Vacate Decree of Adoption was dismissed.

Prior to dismissal of the Petition to Vacate, the trial court also denied the appellant's motion to proceed in forma pauperis and his motion to compel the natural mother to answer forty-nine (49) questions certified to the court by appellant's attorney.

## FACTS

The appellant and the natural mother met in January, 1982 in Shawnee where they both lived. They continued to date for seven months until August 15, 1982. Appellant then left Shawnee to go to an Indian school at Eufaula. [Tr. p. 122–123]. Although appellant knew when he left Shawnee for Eufaula that the mother was pregnant, he gave no thought to his future with the baby and did nothing as far as a commitment to the mother or baby. [Tr. p. 98, 121, 130] While at Eufaula Indian School from August 15, 1982 to December 22, 1982 he telephoned the mother in September [Tr. p. 91] and, although he made five or six trips to Indian "stomp dances" at Seminole approximately 17 or 18 miles from Shawnee and came to Shawnee at Thanksgiving [Tr. p. 100 and 126], he made no attempt to contact the mother. [Tr. p. 99, 127] After three months at the Indian school (around November, 1982) the appellant again "just lost interest in school" [Tr. p. 131] and on December 22, 1982 came back to Shawnee. He did not, however, tell the natural mother about his return. [Tr. p. 131] He remained in Shawnee from December 22, 1982 until March 1, 1983 during which time he neither called the mother nor wrote her a letter. [Tr. p. 133, 134] Appellant had two contacts with the mother during that time, neither initiated by him. On December 24, 1982, he "bumped into" the natural mother at a record store in Shawnee but he did not discuss the baby's future. [Tr. p. 101] The other contact occurred February 2, 1983 when the natural mother came to his home to tell him she was going to put the baby up for adoption and that she did not want any interference from him. He made no objection or response. He did not want to have anything to do with the mother or the child. [Tr. p. 135–137]

Approximately on March 1, 1983 appellant went to Muskogee to live with his brother and go to school there. [Tr. p. 103, 104] Again, he did not tell the natural mother, whose baby he knew was due the end of March or first of April, that he was going. [Tr. p. 154] During the entire time, appellant never suggested to his family that the natural mother was pregnant with his child. They learned accidentally when a member of the family heard about it and told the appellant's father's mother. At that point on March 30, 1983 four days before the birth of the child, appellant still had no interest. [Tr. p. 138]

Throughout the mother's pregnancy, appellant did not make an effort to assist the natural mother in any way. He did not offer financial support nor did he offer to marry her. [Tr. p. 124, 132, 141] The baby was born on April 4, 1983. Appellant first contacted the natural mother by telephone on the 22nd or 27th of April, 1983. [Tr. p. 140] He never told the natural mother he wanted the child until after May 25, 1983 when his suit was filed. [Tr. p. 144]

## ISSUES

The following issues are presented on appeal:

(1) Whether an unwed father of a newborn child has standing to challenge the constitutionality of the Oklahoma adoption statutes that allowed the adoption of his newborn child without his consent, and did not require he be given notice and an opportunity to be heard.

(2) Whether an unwed Indian father of a newborn child has standing under the Federal and Oklahoma Indian Child Welfare Acts to challenge the adoption of his child.

(3) Whether the Oklahoma Adoption statutes allowing the adoption of a child born out of wedlock without the consent of the natural father and without requiring notice and the opportunity to be heard to the unwed father are constitutional.

(4) Whether under the facts of this case, the denial of forma pauperis status was contrary to law and a denial of due process.

(5) Whether the trial court erred in overruling the appellant's motion to compel wherein the appellant requested the trial court to compel the natural mother to answer forty-nine (49) questions certified to the court by appellant.

## I.

### DOES APPELLANT HAVE STANDING TO CHALLENGE THE CONSTITUTIONALITY OF THE OKLAHOMA ADOPTION STATUTES?

■ "Standing" is the legal right of a person to challenge the conduct of another in a judicial forum.[6] The United States Supreme Court has stated:

"When standing is placed in issue in a case, the question is whether the person whose standing is challenged, is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable." [7]

As this court has stated:

" 'Standing' is the right to commence litigation, to take the initial step that frames legal issues for ultimate adjudication by a court or jury." [8]

■ When standing of a party is brought into issue, the focus is on the *party* seeking to get his complaint before the court and not on the issues he wishes to have adjudicated.[9] On review of the trial court's ruling on the appellant's standing, it is not necessary to decide whether appellant will ultimately be entitled to any relief but whether he has the legal right to seek judicial redress for his grievance. The proper inquiry concerning standing is whether the defendant has in fact suffered injury to a legally protected interest as

contemplated by statutory or constitutional provisions.[10]

In his amended petition, appellant alleged *inter alia*, that he is the natural father of Baby Boy D, that a final decree of adoption has been entered for Baby Boy D, and that the relinquishment and adoption of the child by maternal consent alone as authorized by 10 O.S. §§ 60.5(2) and 10 O.S. § 29(2)(g) violated his rights of due process guaranteed by the 5th and 14th Amendments of the United States Constitution.

■ As a matter of law, his legal rights and interest in his newborn child were terminated by the adoption proceeding if the adoption is allowed to stand. He alleges that this liberty interest has been denied without due process of law. Focusing our consideration on the appellant and the allegations in his petition, we find that he has standing to challenge the adoption statutes of this state on the basis of his allegations that he was denied his liberty interest in his son.

## II.

### DOES APPELLANT HAVE STANDING TO CHALLENGE THIS ADOPTION UNDER THE FEDERAL AND OKLAHOMA INDIAN CHILD WELFARE ACTS?

The Indian Child Welfare Act (ICWA)[11] is structured around the concern "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies" and placed in non-Indian homes and institutions.[12] Congress has declared the policy of this Nation in passing the ICWA as follows:

**6.** *State ex rel. Cartwright v. Oklahoma Tax Com'n.,* 653 P.2d 1230, 1232 (Okl.1982).

**7.** *Flast v. Cohen,* 392 U.S. 83, 99–100, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968).

**8.** Supra note 6.

**9.** *Democratic Party of Oklahoma v. Estep,* 652 P.2d 271, 274 (Okl.1982); *Application of State ex*

*rel. Dept. of Transp.,* 646 P.2d 605, 609 (Okl. 1982).

**10.** *Independent School Dist. No. 9 of Tulsa County v. Glass,* 639 P.2d 1233, 1237 (Okl.1982).

**11.** Supra note 1.

**12.** 25 U.S.C. § 1901(4).

"... [T]o protect the best interest of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture...." [13]

The central thrust and concern of the ICWA is, therefore, "the establishment of minimum federal standards for the removal of Indian children from their families".

Numerous provisions of the act support this conclusion.

Section 1901(4) states:

"[A]n alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them...."

Section 1911(a) provides exclusive jurisdiction in the Indian tribe:

"Over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation...."

Section 1912 addresses pending court proceedings. Subsection (d) requires:

"Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to *prevent the breakup of the Indian family* and that these efforts have proved unsuccessful. (emphasis added).

Subsection (e) declares:

"No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the *continued custody* of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (emphasis added).

Subsection (f) states:

"No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the *continued custody* of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. (emphasis added).

The Indian Child Welfare Act is applicable, therefore, when we are confronted with the removal of Indian children from their families. The purpose of the act is to promote the best interest of Indian children through promoting the stability and security of Indian tribes and families by the establishment of minimum federal standards for the removal of Indian children from their families. The act is applicable when you have Indian children being removed from their existing Indian environment.

Oklahoma also has an Indian Child Welfare Act (OICWA).[14] The stated purpose of the act is the "clarification of state policies and procedures regarding the implementation by the State of Oklahoma of the Federal Indian Child Welfare Act" and to "cooperate fully with Indian tribes in Oklahoma in order to insure that the intent and provisions of the Federal Indian Child Welfare Act are enforced".[15] The Oklahoma Indian Child Welfare Act applies when the ICWA is applicable.[16]

The appellant claims that he has standing under the Indian Child Welfare Act to challenge the validity of the adoption of his newborn son based upon violations of Sections 1911, 1912 and 1913 of the ICWA. Section 1911 gives Indian tribes jurisdiction over Indian child custody proceedings involving an Indian child who resides or is domiciled within the reservation of the tribe. Section 1912 addresses pending court proceedings concerning any involuntary proceeding in a state court where the

---

**13.** 25 U.S.C. § 1902.

**14.** 10 O.S.Supp.1984 §§ 40–40.9.

**15.** 10 O.S.Supp.1984 § 40.1.

**16.** 10 O.S.Supp.1984 § 40.3.

court knows or has reason to know that an Indian child is involved. This section requires notice to the parents and to the Indian child's tribe. Section 1913 deals with an Indian parent or custodian giving voluntary consent to a foster care placement or termination of parental rights.

The appellant alleges that these three sections were violated in different specific instances and, therefore, the appellant has standing under Section 1914 which allows:

"[A]ny parent ... from whose custody such [Indian] child was removed ... may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provisions of Sections 1911, 1912, and 1913...."

The ICWA defines parent as follows:

" '[P]arent' means any biological parent or parents of an Indian child or any Indian person who has lawfully adopted an Indian child, including adoptions under tribal law or custom. It does not include the unwed father where paternity has not been acknowledged or established." [17]

The ICWA definition of parent does not include the unwed father where paternity has not been acknowledged or established. *Further, Section 1914 grants standing to invalidate an action only to the parent from whose custody such child was removed.*

■ The appellant made no attempt to acknowledge or establish paternity until he filed his petition to vacate the decree of adoption in the District Court of Stephens County. Until such time as a father has acknowledged or established paternity, the ICWA is not applicable. Congress has by this language evidenced its intent not to extend the ICWA to the child born out of wedlock as in the instant case, whose father has never had custody and has not

acknowledged or established paternity. We take this to mean acknowledged or established through the procedures available through the tribal courts, consistent with tribal customs, or through procedures established by state law.[18] Until paternity is acknowledged or established, an unwed Indian father has failed to lay legal claim to the child and the ICWA is not applicable.[19]

■ This construction of the ICWA is in accord with the stated purpose of the act to protect Indian children from the destruction of Indian family units by child welfare agencies and courts. The ICWA emphasizes that the Congress seeks to protect the Indian child by setting minimum federal standards for the removal of that Indian child from an existing Indian family unit.[20] Here we have a child who has never resided in an Indian family, and who has a non-Indian mother. For the foregoing reasons we conclude appellant lacks standing to invoke the ICWA in this case.

### III.

### ARE THE OKLAHOMA ADOPTION STATUTES UNCONSTITUTIONAL AS TO THIS UNWED FATHER?

The appellant challenges the constitutionality of the Oklahoma adoption statutes [21] on two fronts. We have held that he has standing to do so. He claims that these statutes violated his Fifth and Fourteenth amendment rights to due process and equal protection. Although there was notice by publication, he contends that this notice was not sufficient to meet due process requirements under the circumstances of this case. He argues, therefore, his interest in his newborn child was denied him without due process because he did not receive notice and the opportunity to be heard on the adoption of his newborn child.[22] He con-

---

**17.** 25 U.S.C. § 1903(9).

**18.** 10 O.S.1981 §§ 55, 60.3(4).

**19.** See *Matter of Appeal in Maricopa County,* 136 Ariz. 528, 667 P.2d 228 (Ariz.App.1983).

**20.** 25 U.S.C. § 1902.

**21.** Oklahoma Uniform Adoption Act, 10 O.S. 1981 §§ 60.1–60.23.

**22.** 10 O.S.1981 § 60.5 states "An adoption of a child may be decreed when there has been filed a written consent to adoption executed by: (2) If the child is born out of wedlock, its mother, if sixteen (16) years of age or older, shall be

tends that his right to equal protection was violated by the Oklahoma adoption statutes because they require the consent of, and thereby afford notice and an opportunity to be heard to, fathers and mothers of legitimate children, and to mothers of illegitimate children but not to fathers of illegitimate children.[23] In our consideration of these challenges to the constitutionality to the Oklahoma adoption statutes, we will address first the due process argument, then the one concerning equal protection.

## A. DUE PROCESS

The appellant contends that he was denied his interest in his newborn child without due process of law by the Oklahoma adoption statutes. In addressing this allegation this Court must answer the following question:

Was the interest of the appellant-unwed father of such constitutional stature that due process required he be given notice and the opportunity to be heard on the adoption of his newborn child?

■ The Fourteenth Amendment provides that no state shall deprive any person of life, liberty, or property without due process of law.[24] When that clause is invoked in that context, this Court must make a determination of the precise nature of the private interest that is threatened by the state.[25] Only after that interest has been identified can a proper evaluation of the adequacy of the state's process be made.[26] We, therefore, first consider the nature of the interest in liberty for which appellant claims constitutional protection, and then turn to the discussion of the adequacy of the procedure that Oklahoma has provided for such protection.

In legal problems arising from the parent-child relationship, the United States Supreme Court has held in some cases that the Federal Constitution supercedes state law and provides even greater protection for certain formal family relationships. In those cases the Court has emphasized that the paramount interest is the welfare of the child and has noted that the rights of the parents are a counterpart of the responsibilities they have assumed.

The Supreme Court, in its development of the constitutional theory of parental rights, has given attention to the protection to be given to biological parents who have developed emotional bonds with their children. Those emotional bonds are a critical factor in the determination of the constitutional right of biological parents to maintain their relation with their children. A biological relationship is of constitutional significance because it offers biological parents a unique opportunity to develop these emotional bonds with their children.[27]

The Court has examined the extent to which a natural, unwed father's biological relationship with his child receives protection under the due process clause in precisely four cases: *Stanley v. Illinois,*[28] *Quilloin v. Walcott,*[29] *Caban v. Mohammed*[30] and *Lehr v. Robertson.*[31] These cases are important in the instant case because only when the Court has determined the unwed father to be one whose relationship with his child has amounted to a custodial relationship, has the Court re-

deemed capable of giving consent." Because the consent of the unwed father of the child born out of wedlock is not required, there is no provision for notice or the opportunity to be heard to the father.

23. 10 O.S.1981 § 60.6 states, "A legitimate child cannot be adopted without the consent of its parents, if living, nor a child born out of wedlock without the consent of its mother, if living...."

24. U.S. Const. amend. XIV, § 1.

25. *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895–896, 81 S.Ct. 1743, 1748–1749, 6 L.Ed.2d 1230 (1961).

26. *Morrissey v. Brewer,* 408 U.S. 471, 482–83, 92 S.Ct. 2593, 2600–2601, 33 L.Ed.2d 484 (1972).

27. *Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983).

28. 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

29. 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978).

30. 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979).

31. *Lehr* supra note 27.

sponded favorably to the unwed father. In *Stanley v. Illinois,* the Court described Peter Stanley as a man who had "sired and raised" [32] his children. A man who had lived with and supported them all their lives.[33] In the Court's opinion, there was no question that Stanley was the natural father. The Court equated the interest of a custodial unwed father with that of any other custodial parent and gave it equal constitutional stature.

Illinois depended on the conclusive presumption that all unwed fathers are unqualified to have custody of their children. The Court, however, concluded that if Stanley was a fit parent, removal of his children would do nothing to further the state's interest in the welfare and safety of his children. Thus, there was a necessity to disprove Stanley's fitness. As a custodial unwed father, Stanley had a constitutional interest in his relationship with his children equal to the interest of other custodial parents. His interest entitled him to a hearing on his fitness because fitness was the standard applied to state removal of children from other custodial parents. It was his custody of his children, and not his biological connection alone, that gave him an interest of the same stature as that of any other custodial parent.[34]

In *Caban v. Mohammed,*[35] Caban unlike Stanley, could claim protection only for the emotional ties created by a past custodial relationship and not for a current custodial relationship. However, the Court recognized that the relationship established by Caban's former care and support of his children was potentially of equal weight with the relationship they currently had with their custodial mother. At least that weight was equal as against a state statute that gave mothers the power to withhold consent to the adoption of their children, while denying the same power to such fa-

thers. For such purposes, a once-custodial father's relationship is similar to that of a presently custodial mother.

*Caban*[36] is limited to fathers like Caban who have had substantial relationships with their children. Fathers of newborn children are excluded because of the potentially greater difficulties in locating them. Because of a real difference in the availability of the father of newborns, differential treatment of them directed to their unavailability can be justified because of its substantial relationship to the state's interest in promoting adoption, regardless of the similarity of the father's interest to the mother's.[37] The court noted that the argument posed by the general unavailability of unwed fathers did not apply to Caban because fathers like Caban with substantial relationships with their children are clearly not unavailable. But if a father had not established such a relationship with his children, he cannot complain about differential treatment.[38]

In *Quilloin v. Walcott,*[39] Quilloin's relationship with his child was quite different from Stanley's or Caban's. Specifically, he had never consistently supported the child, and had never had nor sought actual or legal custody of the child.[40] Unlike Stanley, the adoption did not terminate a current custodial relationship between a father and his son, and unlike Caban, the adoption did not terminate a current emotional relationship that had been created during a former custodial relationship. Nevertheless, Quilloin claimed that his interest in retaining his relationship with his son was of the same constitutional significance of Stanley's and could not be terminated by the state without the same substantive justification, i.e. proof of his unfitness as a father. Justice Marshall, for a unanimous court, focused on the fact that Quilloin did not have, had never had, and had never

---

**32.** Supra note 28, at 651, 92 S.Ct. at 1212–13.

**33.** Id., at 650, 92 S.Ct. at 1212.

**34.** Id., at 647–50, 92 S.Ct. at 1210–12.

**35.** Supra note 30.

**36.** Id.

**37.** Id., 441 U.S. at 392–93, 99 S.Ct. at 1768–69.

**38.** Id., at 392, 99 S.Ct. at 1768.

**39.** Supra note 29.

**40.** Id., at 255, 98 S.Ct. at 554–55.

even sought actual or legal custody of his child,[41] and permitted the adoption of his child to stand. The Court emphasized the distinction between a custodial father and a noncustodial father and indicated that the interest of noncustodial parents have less constitutional significance than the interest of custodial parents. More recently, the court has distinguished *Stanley* and *Caban* from *Quilloin* by calling the relationships in *Stanley* and *Caban* "developed" and the relationship in *Quilloin* merely "potential".[42] In essence, the distinction relates to the special kind of relationship that is developed by the exercise of custodial responsibilities.

The appellant, who does not presently have and has never had custody of his child, can make no absolute claim that he must be empowered to veto the adoption of his child. Under *Stanley, Caban* and *Quilloin*,[43] custody, the shouldering of significant responsibility with respect to daily supervision, education, and protection, is the *sine qua non* for substantial protection.

In *Lehr v. Robertson*,[44] the natural father, complained that the state's failure to provide for his participation in the proceedings leading to the adoption of his daughter cut off his opportunity to establish a protected relationship with the child. The Court declared that the State of New York was not required to notify Lehr of, nor allow him to participate in, the proceedings leading to the adoption of his child. The state need not always give the father power to veto his child's adoption, nor must the state even consider the father's actual or potential relationship with the child as a factor in determining whether adoption is in the best interest of the child.[45] After *Lehr*,[46] it is clear that in some circumstances the state may constitutionally omit to notify or allow participation by unwed fathers who have never been established officially as being without an interest, and the

state may even deny them participation in the preliminary stage determining that they are without an interest. In the instant case, this court must determine what right, if any, appellant, who has shown no interest in his child or in the care of the mother and the child prior to birth, has with respect to notice and the opportunity to be heard concerning the adoption of his newborn child. From the four Supreme Court cases, we know that his right is certainly less than a father's who has or has had custody and has fulfilled the custodial responsibilities that go with custody.

■ The Constitution protects only parent-child relationships of biological parents who have actually committed themselves to their children and have exercised responsibility for rearing their children. This principal has its basis in the theory that the process of defining which relationships are constitutionally significant includes a consideration of how the competing interests are served by protection. Parents who commit themselves to their children and take responsibility for rearing their children share the state's interest in assuming proper care for their children.

However, the paramount interest to be considered is the child's best interest. Children are not static objects. They grow and develop, and their growth and development require more than day-to-day satisfaction of their physical needs. Their growth and development also require day-to-day satisfaction of their emotional needs, and a primary emotional need is for permanence and stability. Only when their emotional needs are satisfied can children develop the emotional attachments that have independent constitutional significance.[47]

This court recognizes that a child's need for permanence and stability, like his or her other needs, cannot be postponed. It must be provided early. The need for early as-

---

**41.** Id. at 255, 98 S.Ct. at 554–55.

**42.** *Lehr,* supra note 27, 103 S.Ct. at 2993.

**43.** Supra notes 28, 29 and 30.

**44.** Supra note 27 at 2993–5.

**45.** Id.

**46.** Id.

**47.** See *Lehr* supra note 27, at 2993.

surance of permanence and stability is an essential factor in a constitutional determination in the instant case of whether or not to protect the appellant's potential relationship with his child. The basis for constitutional protection is missing if the parent seeking it has not taken on those parental responsibilities which provide such permanence and stability.

In this case, we are concerned with the rights an unwed father of a newborn child has, when his interests and those of the mother are in conflict, and the best interest of the child is served by adoption and legitimation. After consideration of all the interests involved, the legislative goal of the statute and compelling state interest in requiring only the consent of one parent, the mother, is to facilitate adoptions that are in the best interest of the child born out of wedlock. To do otherwise would in many instances deny the child—and the state— the benefits of adoption and legitimation.

Here the appellant made no attempt to provide for the mother during pregnancy. Nor did he attempt to learn when and where the child was to be born. Appellant did not pay, nor attempt to make any arrangements for the payment of the expenses related to the birth and care of the child or mother. He in effect abandoned the support and care of the mother and child during pregnancy and at birth. He did not assume any parental responsibilities.

■ The Oklahoma statutory scheme for adoption of a child born out of wedlock did not require the consent of the appellant and, thereby, did not require that he have notice and an opportunity to be heard concerning the adoption of his child. Under the facts of this case, we hold that the statutory scheme for the adoption of children born out of wedlock is constitutionally sound, and that it was constitutionally permissible to omit notice and the opportunity for the appellant to be heard in the adoption proceedings.

## B. EQUAL PROTECTION

Although gender-based statutory classifications deserve careful constitutional examination,[48] they are not invariably invalid. When men and women are not in fact similarly situated in the area covered by the legislation questioned, the Equal Protection Clause is not violated.[49] Appellant urges on appeal that the Oklahoma statutory scheme allowing adoptions of illegitimate children without the consent of the natural father constitutes a gender-based distinction which is violative of equal protection under the law.

Therefore, it is necessary to determine whether there are differences between the members of the two classes that provide justification for treating them differently. Men and women are different, and the differences are relevant to the question whether the mother may be given the exclusive right to consent to the adoption of a child born out of wedlock. Because the adoption in this case, as in most adoptions, involves a newborn infant, it is appropriate to focus on the significance of the differences in such cases. From the point of conception on, the law recognizes the very real differences between the father and mother concerning the child's destiny. Only the mother has the constitutional right to decide whether to have the child or not have the child.[50] The mother has the right to marry another male before the child is born and affect the "rights" of the natural father who does not even have standing to dispute that the child is the child of the natural mother and her husband.[51] At birth the mother is given custody of the child born out of wedlock.[52] The

**48.** *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

**49.** *Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975).

**50.** See *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 67–75, 96 S.Ct. 2831, 2840–2844, 49 L.Ed.2d 788 (1976).

**51.** 10 O.S.1981 § 3.

**52.** 10 O.S.1981 § 6.

mother may choose to marry the natural father and positively affect his "rights".[53]

From conception through infancy the unwed mother will constantly be faced with decisions about how to best care for the child. It is much less certain that the unwed father will be faced with such problems. At the time and immediately after a child is born out of wedlock, the natural and real differences between the mother and father continue to justify some differential treatment of the mother and father in the adoption process. These differences justify a rule that gives the mother in whose sole charge the infant is often placed the maximum flexibility in deciding how to best care for the child. This is the rationale for a rule that gives the mother of the newborn child born out of wedlock the exclusive right to consent to its adoption.

Also, adequacy of notice to absent fathers could invade the mother's privacy, cause the adopting parents to doubt the reliability of the new relationship, and add to the expense and time required to conclude what is now usually a simple and certain process. Although in *Caban*[54] the Court struck down the New York statute based on an equal protection argument, Caban, as Stanley, had in the past had custody and had exercised the burden of the custodial responsibilities given such importance in the Court's opinion. The Court took special care to distinguish Caban's claim from that of a father of a newborn. Caban had assumed full custodial responsibility for his children and thereby established a relationship equal in every way with that of any other single custodial parent. The Court said, however,:

> "In those cases where the father never has come forward to participate in the rearing of his child, nothing in the Equal Protection Clause precludes the State from withholding from him the privilege of vetoing the adoption of that child." [55]

It must be remembered that there are not two, but three interests at stake: those of the mother's, the father's and child's.

Concerns humane, as well as practical, abundantly support our statutory scheme that only one parent need to consent to the adoption of the illegitimate child, although it requires both parents to consent to the adoption of one already legitimate. If the consent of both unwed parents were required, and one withheld that consent, the illegitimate child would remain illegitimate. We know from *Quilloin*[56] that requiring the consent of only one parent is not in itself constitutionally defective.

In *Quilloin*, the Court found a Georgia Statute which always required a mother's consent to the adoption of a child born out of wedlock, but required the father's consent only if he had legitimated the child, did not violate the Equal Protection Clause. The most relevant consideration by the Court in evaluating both the rights of the parents and the best interest of the child is the existence or non-existence of a substantial relationship between parent and child. In the instant case, that same consideration is sufficiently profound to overcome appellant's claim that he has been invidiously discriminated against because he is a male.

█ In the adoption proceeding the competing interests at stake must be balanced. Granting unwed fathers the same rights as all other parents, but with no guarantee that they would assume the responsibilities that other parents assume, would be giving the unwed father an unqualified right to block an adoption, absent unfitness, even though the adoption might be in the child's best interest. The Supreme Court has been unwilling to allow unwed fathers to have the rights of parenthood without also assuming the responsibilities of parenthood. This reasoning represents a careful balancing of the competing interests at stake. We concur in that reasoning and its result. Requiring the consent to adoption of the natural mother, but not the consent of the natural father, of the child born out of wedlock in the instance case does not deny appellant equal protection of the law.

**53.** 10 O.S.1981 § 2.

**54.** Supra at note 30.

**55.** Id at 391, 99 S.Ct. at 1767.

**56.** Supra at note 29.

## IV.

### SHOULD THE APPELLANT HAVE BEEN ALLOWED TO PROCEED IN FORMA PAUPERIS?

Appellant used a litigation fund of the Seminole Nation of Oklahoma to pay initial costs of his action when he filed his Petition to Vacate on May 25, 1983. On October 6, 1983, he filed a Motion to Proceed In Forma Pauperis.

In support of his motion, appellant filed an affidavit of poverty. In his affidavit he stated, "that he is indigent, wholly without funds, property or other resources whatsoever to pay for transcripts and other services necessary as might normally be expected in order to properly prepare' for trial...."

The motion was denied at a hearing on November 28, 1983. At that hearing, Appellant testified that he was nineteen years old and his only job skills were working as a short order cook and "a little bit of carpentry work". (Rec. at 119, Tr. p. 36) He testified that he finished his high school education on August 25, 1983, and was unemployed for a month thereafter. Then he began working for his brother-in-law's construction company. (Transcript, p. 35) From the time he began that employment the first of October until the November 28 hearing, he had worked only thirty-six hours at a pay rate of $4.00, receiving a gross salary of $146.00. (Rec. at 119, Tr. 34–35)

Appellant further testified that he lived with his mother and paid no rent or utilities, (Rec. at 119, Tr. p. 38), but he had helped his family pay for some groceries. (Rec. at 119, Tr. p. 59) He was drawing no unemployment compensation (Rec. at 119, Tr. p. 51), and had no other work outside of the construction company. (Rec. at 119, p. 53) He did not own a car, did not have any insurance (Rec. at 119, Tr. p. 38), and had no bank account or trust account. (Rec. at 119, Tr. p. 45) He testified that his parents were "in no condition to help me that much," (Rec. at 119, Tr. p. 48), and he had

no financial resources to pay for Human Leukocyte Antigen blood tests for the determination of paternity, (Rec. at 119, Tr. p. 36–37) No witnesses testified on behalf of Appellees.

Oklahoma law provides that no fees or costs shall be required "upon satisfactory showing to the court" that a litigant requesting to proceed in forma pauperis "has no means and is, therefore, unable to pay the applicable fees and costs and to employ counsel".[57] There are no Oklahoma civil cases containing further elaboration on the requirements of the statute governing forma pauperis status.

 Although the appellant has not been denied any fundamental rights nor been prevented from prosecuting his lawsuit in the trial court or on appeal, we find that the trial court erred in overruling the appellant's Motion to Proceed In Forma Pauperis. The appellant established through his affidavit and oral testimony that he was an indigent party who had no means to pay fees and costs. We remand this matter to the trial court to determine who shall be reimbursed for fees and the costs of this action including filing fees, the Human Leukocyte Antigen blood test[58] and any other costs authorized by law for reimbursement by reason of poverty.

## V.

### WAS THERE ERROR IN REFUSAL TO COMPEL THE MOTHER TO ANSWER THE CERTIFIED QUESTIONS?

The appellant contends that the trial court erred in not compelling the natural mother to answer forty-nine (49) questions certified to the court. We find that the arguments of the appellant are not persuasive in light of the prevailing law. We further find this question to be moot as a result of our holdings in parts II and III of this opinion.

---

**57.** 28 O.S.Supp.1984 § 152.

**58.** See 10 O.S.1984 Supp. §§ 502, 503.

CONCLUSION

We hold that the appellant does not have standing under the Indian Child Welfare Act and Oklahoma Indian Child Welfare Act to vacate the Decree of Adoption. We hold that he does have standing to challenge the constitutionality of the Oklahoma adoption statutes but that his interest in his newborn child was not of such constitutional stature that required he be given the right to veto the adoption by requiring his consent. In this regard notice and the opportunity to be heard on the adoption of his child were not, therefore, required under the due process clause of the Fourteenth Amendment. Nor was the appellant denied equal protection under the law because his consent was not required whereas the consent of the natural mother was.

We hold that the trial court erred in overruling the appellant's Motion to Proceed In Forma Pauperis and we remand this matter to the trial court as per our instructions. We hold the issue of the court's overruling the appellant's motion to compel to be moot in light of our holdings above.

Affirmed in part; reversed in part; remanded with instructions.

SIMMS, C.J., DOOLIN, V.C.J., and HARGRAVE and WILSON, JJ., concur.

1. *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 764–67, 105 S.Ct. 2399, 2403–04, 85 L.Ed.2d 753, 759 (1985); *McClanahan v. Arizona Tax Comm'n,* 411 U.S. 164, 174, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973); *Choate v. Trapp,* 224 U.S. 665, 675, 32 S.Ct. 565, 569, 56 L.Ed. 941 (1912). *Ahboah v. Housing Auth. of Kiowa Tribe,* 660 P.2d 625, 631 (Okla.1983).

2. The purpose is stated in 10 O.S.Supp.1982 § 40.1:
"The purpose of the Oklahoma Indian Child Welfare Act is the clarification of state policies and procedures regarding the imlementation by the State of Oklahoma of the Federal Indian Child Welfare Act, P.L. 95–608. It shall be the policy of the state to cooperate fully with Indian tribes in Oklahoma in order to ensure that the intent and provisions of the Federal Indian Child Welfare Act are enforced."

3. Application of the Act is provided in 10 O.S. Supp.1982 § 40.3:

LAVENDER, J., concurs in Part 1, and dissents to Parts 2, 3 and 5.

KAUGER, J., concurs in Parts 1 and 4, and dissents to Parts 2, 3 and 5.

HODGES and OPALA, JJ., dissent.

KAUGER, Justice, concurring in part, dissenting in part.

I agree with the majority's conclusion in parts I and IV that the father had standing to challenge the constitutionality of the Oklahoma adoption statutes, and that the father should have been permitted to proceed *in forma pauperis.* I dissent from the holdings in parts II, III, and V for the reasons stated below.

Although, it is well settled that statutes involving Indians are to be construed liberally in their favor,[1] in this case, the Indians were cut off at the pass after the trial court, with the acquiescence of the majority, ignored the Oklahoma Indian Child Welfare Act. (OICWA). The Oklahoma Act clarifies state policies and procedures to insure that both the intent and the provisions of the federal ICWA are enforced.[2] The announced policy of the OICWA is to cooperate fully with the Indian tribes of the state. All custody proceedings involving children who are members of an Indian tribe, eligible for tribal membership, or biological children of tribal members fall within its purview.[3]

"A. The Oklahoma Indian Child Welfare Act, in accordance with the Federal Indian Child Welfare Act, applies to all child custody proceedings involving any Indian child except the following:
1. A child custody proceeding arising from a divorce proceeding; or
2. A child custody proceeding arising from an adjudication of delinquency, unless there has been a request for termination of parental rights.
B. The Oklahoma Indian Child Welfare Act applies only to a child who is a member of an Indian tribe or who is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.
C. The court shall seek a determination of the Indian status of the child in accordance with the preceding standard in the following circumstances:
1. The court has been informed by an interested party, an officer of the court, a tribe, an

Well before this country became a nation, the insensitive precedent had been cast to destroy Indian culture and tribal cohesiveness by removing Indian children from their families and tribal environments.[4] Continuing separation of Indian children from their heritage is one of the most tragic and destructive aspects of contemporary Indian life. State intrusion into Native American parent-child relationships impedes the ability of the tribe to perpetuate itself, and, ultimately, it unjustifiably results in a coerced assimilation of the First Americans into a larger more homogenous society.[5] Congress recognized that Indian children are the most vital component to the continued existence of the tribes when it enacted the Indian Child Welfare Act of 1978, 25 U.S.C. § 1901 et seq., in an attempt to meet its responsibilities as the guardian and protector of American Indians.[6] The majority, exercising traditional Anglo-Saxon notions of child custody proceedings, has failed completely to recognize essential tribal relations, and the right which Native Americans possess to preserve their identity as a people.

## I

## THE TRIBE AND THE PUTATIVE FATHER OF AN INDIAN CHILD BORN OUT OF WEDLOCK ARE ENTITLED TO NOTICE OF PENDING ADOPTION PROCEEDINGS

If a trial court has reason to believe that an infant subject to adoption is an Indian child, it must first seek to verify the child's status with the tribe(s) which may be the tribe of the Indian child, or with the Bureau of Indian Affairs.[7] Here, the adop-

Indian organization or a public or private agency that the child is Indian; or
2. The child who is the subject of the proceeding gives the court reason to believe he is an Indian child; or
3. The court has reason to believe the residence or domicile of the child is a predominantly Indian community.
D. The court shall seek verification of the Indian status of the child from the Indian tribe or the Bureau of Indian Affairs. A determination of membership by an Indian tribe shall be conclusive. A determination of membership by the Bureau of Indian Affairs shall be conclusive in the absence of a contrary determination by the Indian tribe.
E. The determination of the Indian status of a child shall be made as soon as practicable in order to ensure compliance with the notice requirements of Section 5 of the Oklahoma Indian Child Welfare Act."

4. On June 17, 1744, the commissioners from Maryland and Virginia negotiated a treaty with the Indians of the Six Nations at Lancaster, Pennsylvania. The Indians were invited to send boys to William and Mary College. The next day, the Six Nations politely declined the offer. Their letter stated:
"We know that you highly esteem the kind of learning taught in those Colleges, and the Maintenance of our young Men, while with you, would be very expensive to you. We are convinced, that you mean to do us Good by your Proposal; and we thank you heartily. But you, who are wise must know that different Nations have different Conceptions of things and you will therefore not take it amiss, if our Ideas of this kind of Education happen not to be the same as yours. We have had some Experience of it. Several of our

Young People were formerly brought up at the Colleges of the Northern Provinces; they were instructed in all your Sciences; but, when they came back to us, they were bad Runners, ignorant of every means of living in the woods ... neither fit for Hunters, Warriors, nor Counsellors, they were totally good for nothing. We are, however, not the less oblig'd by your kind Offer, tho' we decline accepting it; and, to show our grateful Sense of it, if the Gentlemen of Virginia will send us a Dozen of their Sons, we will take Care of their Education, instruct them in all we know, and make Men of them.
See 1 Drake, Biography and History of the Indians of North America, Ch. 35, p. 27 (3d. ed. 1834).

5. Guerrero, "Indian Child Welfare Act of 1978: A Response to the Threat to Indian Culture Caused by Foster and Adoptive Placements of Indian Children," 7 American Indian L.Rev. 51, 53 (1979).

6. Title 25 U.S.C. § 1901(3) (1983) provides:
"... that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe; ..."

7. Notice requirements are set forth in 10 O.S. Supp.1982 § 40.4:
"In any involuntary Indian child custody proceedings of the Oklahoma Indian Child Welfare Act, including review hearings, the court shall send notice to the parents or to the

tion is invalid because the court, ignoring the mandate of the Act, as well as due process of law, failed to seek a determination of the child's status from either the tribe or the BIA, or to notify the tribe or the putative father of the impending adoption proceedings. Even though the father was a resident of Pottawatomie County, and the tribe's official office was maintained in Seminole County, the only notice of the pending adoption was by publication in a Stephens County newspaper.[8] The majority opinion, sanctioning the adoption, is grounded in flawed premises: 1) that the Indian Child Welfare Acts are inapplicable to children who are not domiciled in Indian homes; and 2) that the provisions of the federal act do not pertain to unwed fathers.

A careful perusal of the federal ICWA reflects that unwed fathers are not excluded unless paternity has not been *acknowledged* or *established*.[9] The father in this case attempted to acknowledge paternity, and the adverse parties have never contended seriously that the putative father

was not the biological father.[10] A literal reading of the federal act dictates applicability here.

On this point, the fatal fallacy in the majority opinion is that it distinguishes, without citation of authority, biological parents who actually have exercised responsibility for rearing their children from those who have not. At birth, the infant was adopted directly from the hospital, and the Indian father was given no opportunity to comply with the standards of *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), *Caban v. Mohammed*, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), and *Quilloin v. Wallcott*, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), or to institute a relationship with his son. The adoption proceedings were telescoped, thereby excluding his, his family's, and the tribe's claim to the child. The discriminating treatment of parents of children born out of wedlock from other parents by providing substandard procedures for termi-

Indian custodians, if any, to the tribe that may be the tribe of the Indian child, and to the appropriate Bureau of Indian Affairs area office, by registered mail return receipt requested. The notice shall be written in clear and understandable language and include the following information:

1. The name and tribal affiliation of the Indian child;
2. A copy of the petition by which the proceeding was initiated;
3. A statement of the rights of the biological parents or Indian custodians, and the Indian tribe.
 a. to intervene in the proceeding,
 b. to petition the court to transfer the proceeding to the tribal court of the Indian child, and
 c. to request an additional twenty (20) days from receipt of notice to prepare for the proceeding; further extensions of time may be granted with court approval;
4. A statement of the potential legal consequences of an adjudication on the future custodial rights of the parents or Indian custodians;
5. A statement that if the parents or Indian custodian are unable to afford counsel, counsel will be appointed to represent them; and
6. A statement that tribal officials should keep confidential the information contained in the notice."

**8.** *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 797–801, 103 S.Ct. 2706, 2711–12, 77 L.Ed.2d 180, 187–88 (1983); *Armstrong v. Man-*

*zo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965); *Schroeder v. City of New York*, 371 U.S. 208, 213, 83 S.Ct. 279, 282, 9 L.Ed.2d 255, 89 A.L.R.2d 1398 (1962); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 318–20, 70 S.Ct. 652, 659–60, 94 L.Ed. 865, 875–76 (1950); *Cate v. Archon Oil Co. Inc.*, 695 P.2d 1352, 1356 (Okla.1985); *Bomford v. Socony Mobil Oil Co.*, 440 P.2d 713, 718 (Okla.1968).

**9.** The Federal definition of parent is provided in 25 U.S.C. § 1903(9) (1983):
"... (9) 'parent' means any biological parent or parents of an Indian child or any Indian person who has lawfully adopted an Indian child, including adoptions under tribal law or custom. It does not include the unwed father where paternity has not been acknowledged or established; ..."

**10.** Legitimization by acknowledgement is provided in 10 O.S.1981 § 55:
"The father of an illegitimate child by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such, and such child is thereupon deemed for all purposes legitimate from the time of its birth. The status thus created is that of a child adopted by regular procedure of court."
See also *In Re Estate of LaSarge*, 526 P.2d 930, 932 (Okla.1974).

nation of their parental rights is an impermissible violation of the equal protection clause of the United States Constitution and of the Okla. Const. art. 5 § 59.[11] The Oklahoma Legislature has recognized that a proceeding such as this denies due process and equal protection. It has amended 10 O.S. 1981 § 60.6 to require notice and hearing before fathers of children born out of wedlock may have their parental rights terminated.[12] [The procedural requisites were in place before the amendments—the amendments merely codified extant constitutional law]

Even, assuming arguendo, that the federal ICWA is inapplicable, the State of Oklahoma, in the exercise of its sovereign powers, may provide individual liberties which are more expansive than those conferred by the United States.[13] Although the majority refuses to acknowledge state supremacy in this matter the federal act does not. Title 25 U.S.C. § 1921[14] requires that state standards must be applied in lieu of federal law if the state affords a higher degree of protection to the rights of the parent of an Indian child. That a father of a child born out of wedlock has protected rights concerning his natural child is well documented in the OICWA, and by the

recent amendment of § 60.6.[15] The father and the tribe were entitled to notice and to an opportunity to be heard.

## II

## AN INDIAN CHILD NEED NOT BE DOMICILED WITH AN INDIAN FAMILY TO BE PROTECTED BY THE INDIAN CHILD WELFARE ACTS

According to the majority opinion, the purpose of the federal ICWA is to prevent Indian children from being removed from existing Indian family units. It holds that the Act may be disregarded if the child has been living in a non-Indian familial setting. Again, the majority misconstrues the Acts.

Indian lifestyles differ markedly from those of the non-Indian world. Continuing tribal traditions result in a world view and a concept of group identity which create a culture within a culture, the values of which generally are unknown, unnoticed, or unrecognized by those who are unacquainted with tribal customs. The significant differences in tribal values concerning heritage, kinship, concepts of time, scheduling seasonal activities, geographical location, race, religion, economics, language,

---

**11.** *Wilson v. Foster,* 595 P.2d 1329, 1333 (Okla. 1979).

**12.** See H.B. 1308, 7 Okla. Sessions Law 1521, 1524 (1985), which provides in pertinent part:
"3. The father or putative father of a child born out of wedlock if
a. prior to the hearing provided for in Section 4 of this act, and having actual knowledge of the birth or impending birth of the child believed to be his child, he fails to acknowledge paternity of the child or to take any action to legally establish his claim to paternity of the child or to exercise parental rights or duties over the child, including failure to contribute to the support of the mother of the child to the extent of his financial ability during her term of pregnancy, or
b. at the hearing provided for in Section 4 of this act:
(1) he fails to prove that he is the father of the child, or
(2) having established paternity, he fails to prove that he has exercised parental rights and duties toward the child unless he proves that he had no knowledge of the child or had no opportunity to exercise parental rights and duties toward the child, or

c. he waives in writing his right to notice of the hearing provided for in Section 4 of this act, or
d. he fails to appear at the hearing provided for in Section 4 of this act if all notice requirements have been met...."

**13.** *Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 2040–41, 64 L.Ed.2d 741 (1980); *Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859, 864 (1979); *Bailey v. City of Tulsa,* 491 P.2d 316, 318 (Okla.Crim.1971); *Dean v. Crisp,* 536 P.2d 961, 963 (Okla.Crim.1975).

**14.** Title 25 U.S.C. § 1921 (1983) provides:
"In any case where State or Federal law applicable to a child custody proceeding under State or Federal law provides a higher standard of protection to the rights of the parent or Indian custodian of an Indian child than the rights provided under this subchapter, the State or Federal court shall apply the State or Federal standard."

**15.** Evans, "Independent Adoptions: In Whose Best Interests?" 53 O.B.J. 1805, 1808 (1982).

historicity, sexual mores, and family practices and structure [16] must be recognized,[17] notwithstanding their apparent incompatibility with middle class mores.

Courts must not be victimized by cultural myopia in a well-intentioned attempt to represent majoritarian norms. Courts have an obligation to become more sensitive to different cultural values existing within our pluralistic society.[18] In the case of the Native Americans, it must be realized that the relationship of Indian tribes to American society, is, and has always been, an especially unique relationship premised *not* upon race, but upon law created by the United States Constitution, and perpetuated by treaties, [albeit more often breached than honored], between sovereign nations. To those who fear that a child of mixed blood will not be stamped with the imprimatur of the dominant society, the answer is, the dominant society will impact on minority traditions and mores, but the heritage of the Indian people will not be transmitted and assimilated by its youth in the absence of exposure within the tribal community.

The 1960's and 1970's were watershed years for juvenile courts, and the social service personnel involved with them. In three decisions—*In Re Winship,* 397 U.S. 358, 368, 90 S.Ct. 1068, 1074–75, 25 L.Ed.2d 368 (1970); *In Re Gault,* 387 U.S. 1, 26, 87 S.Ct. 1428, 1443, 18 L.Ed.2d 527 (1967); *Kent v. United States,* 383 U.S. 541, 555, 86 S.Ct. 1045, 1054, 16 L.Ed.2d 84 (1966)— the United States Supreme Court advised the States that the informal *parens patriae* system had violated children's rights and that significant changes in procedure were necessary. In 1974, and 1977, the United States Senate Subcommittee on Indian Affairs heard testimony that state juvenile courts were failing Indian children, their families, and their tribes.

The problems were so significant that Congress realized that federal intervention was necessary—the result was the Indian Child Welfare Act of 1978. The evidence presented which prompted Congressional action established that Indian children were being removed from their homes and families in far greater numbers than non-Indian children. The Association on American Indian Affairs, a national non-profit organization founded in 1923, to assist American and Alaskan Native communities to achieve full civic, social and economic equality, conducted surveys in 1969 and 1974. The surveys reflected that approximately 25 to 35 percent of all American Indian Children were separated from their families and placed in foster homes or adoptive homes, and that nearly one in every four Native American infants under one year of age were adopted.[19] Social worker misunderstanding of Indian family life was often the basis for the removals, which in a high percentage of cases, were based on perception of neglect rather than on allegations of physical abuse. Underlying social work, and court decisions, was the presumption, shared by others in the non-Indian world, that an Indian child was better off joining the larger society as soon as possible.

The results of misguided intervention do not validate its philosophical premises. What may appear to be advantageous developmentally for the small child may rob the child of his/her cultural heritage, and be detrimental to later development not only of Indian children, but of their families and communities as well. Psychiatrists and street level Indian social workers testified to significant social and psychological problems among Indian children placed in non-Indian homes. The problems particularly manifested themselves in adolescense and young adulthood when the protective cocoon provided by the adoptive or foster parents could no longer isolate the child

---

16. See note 5, supra.

17. *Wisconsin Pottawatomies v. Houston,* 393 F.Supp. 719, 724 (N.D.Mich.1973); *Carle v. Carle,* 503 P.2d 1050, 1055 (Alaska 1972); *Alvarado v. State,* 486 P.2d 891, 902 (Alaska 1971).

18. *Moore v. East Cleveland,* 431 U.S. 494, 501, 508, 97 S.Ct. 1932, 1936–37, 1940, 52 L.Ed.2d 531 (1977).

19. McCartney, "The American Indian Child Welfare Crisis: Cultural Genocide or First Amendment Preservation," 7 Cal. Human Rights L.Rev. 529 (1975).

from the realities of "growing up Indian." In many cases the result was suicide.[20]

This general principle of differing familial standards was discussed in *In the Matter of Sherol A.S.*, 581 P.2d 884, 888 (Okla. 1978). This Court, in a unanimous opinion, held that the fundamental integrity of the family unit is subject to state intrusion and dismemberment only if the child must be protected from harm; and that the state may not exact either conformity or an acceptable common value system and lifestyle from its citizen-parents. Finally, in 1982, the Oklahoma Legislature heard testimony regarding the federal Act and concluded that it was necessary to provide supplemental procedural safeguards. In 1984, Rule 8.2, Rules of District Court, 12 O.S.Supp.1984 Ch. 2, App., was promulgated by this Court requiring all relevant final orders to contain a finding of compliance with the Acts.

The word orphan, illegitimate, and adoption do not exist naturally in any Native American language,[21] most likely because of the predominant cultural pattern of the extended family found among North American Indians. The phenomenon of the corporate tribal embrace was first described by the American anthropologist, Lewis Morgan, in 1871. He noted that within the tribes all members of the same generation knew one another as brother and sisters, while the parental generation were recognized as mothers and fathers. This kind of classification system reflects a feeling of unity within lineages. Morgan found that the care of children was a joint, rather than an individual responsibility. Morgan's research also discovered that these people had a keen interest in their genetic relationships, and an obsession with tribal kinship.[22] Generally, the dynamics of Indian extended families are misunderstood by well meaning social workers—and by well meaning jurists. The failure of the majority to recognize this is undoubtedly the underlying reason for its erroneous conclusion. Nevertheless, the extended family is as much entitled to constitutional recognition as is the more common nuclear family. Neither the Constitution of the United States nor the State of Oklahoma tolerate governmental or societal imposition upon Indians of suburbia's preference in patterns of family living.[23]

States may not act if essential tribal relations are involved or if the rights of Indians are jeopardized.[24] Child rearing is an essential tribal function,[25] and the pertinent provisions of the Act, 25 U.S.C. § 1911(b) (1983), recognize this by requiring transfer of termination proceedings to the tribe [which the tribe or either parent may veto] *even if* an Indian child is not domiciled or residing within the tribal reservation.[26] Obviously, the concept of a child's tribal status or membership is much more important than the child's domicile because of the tribe's shared responsibility for all its

---

**20.** Berlin, "Anglo Adoptions of Native Americans: Repercussion in Adolescence," 17 Journal of the American Academy of Child Psychiatry 387–88 (1978); Green, "Risks and Attitudes Associated with Extra-Cultural Placement of American Indian Children: A Critical Review," 22 Journal of the American Academy of Child Psychiatry 63 (1983). Benefield, "The Indian Child Welfare Acts," Training Manual of the Foster Care Review Board (1984).

**21.** Report on Bottle Hollow, Utah Conference on Supportive Care, Custody, Placement and Adoption of American Indian Children, American Academy of Child Psychiatry, p. 19 (1977).

**22.** C. Darlington, The Evolution of Man and Society, Ch. 3, p. 50–1 (Simon and Schuster 1975).

**23.** See *Moore v. East Cleveland,* note 18 supra.

**24.** *Williams v. Lee,* 358 U.S. 217, 220–21, 79 S.Ct. 269, 270–71, 3 L.Ed.2d 251, 254 (1959).

**25.** *Wakefield v. Little Light,* 276 Md. 333, 347 A.2d 228, 237–38 (1975).

**26.** Title 25 U.S.C. § 1911(b) (1983) provides: "... In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, *absent objection by either parent,* upon the petition of either parent or the Indian custodian or the Indian child's tribe: Provided, That such transfer shall be subject to declination by the tribal court of such tribe."

child members.[27] The Acts clearly pertain to all Indian children.[28] No distinction is made based on reservation status or environmental circumstance.

The putative biological father did not confide in his full-blood parents concerning the pregnancy. His mother, a Creek, discovered the fact on March 29, 1983. The extended family tradition is illustrated by her deposition testimony reflecting the grandmother's reaction to the baby's birth on March 4, and the adoption of the child on March 6. In answer to the question, "You would be proud to have your grandchildren? She replied "I wouldn't give my baby away." To the query, "Are you considering this your baby, then?" She responded, "Yes." The record reveals that when the grandmother of this child learned of the birth, the father's interest was triggered. This is in keeping with the traditional concept of automatic assumption of responsibility by the closest relatives of the extended family. Depending on tribal affiliation, the nearest relatives may be either on the matrilineal or the patrilineal side. In many Indian cultures, the day-to-day care of the children lodged with the grandparents even when the parents are alive. [The term grandfather also includes paternal great uncles, likewise the term grandmother includes great aunts.][29]

Section 1915 of the Act states that in the absence of good cause, preference in adoption must be given to 1) a member of the child's extended family, 2) other members of the child's tribe, or 3) other Indian families. This section is to be interpreted, when possible, to keep the child within the tribe, *but it does not preclude placement of an Indian child with a non-Indian family.* However, in this case, the wagons were circled before the Indians could send up a smoke signal, much less appear on the bluff. Much of the Indian way of life is a separate and distinguishable culture worthy of preservation. Individual members, as well as the tribal corporate body, are entitled to constitutional protection.

---

**27.** See note 5, supra.

**28.** The U.S. Const. art. I § 8(3) provides:
"To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes;"

**29.** See notes 5, 19, 20, 21, supra.