**In the Matter of the ADOPTION OF BABY GIRL M., a Minor Child.**

**No. 86784.**

Court of Civil Appeals of Oklahoma, Division No. 1.

Feb. 25, 1997.

Rehearing Denied April 1, 1997.

Certiorari Denied June 13, 1997.

**236**

Christine N. Gronlund, Gary A. Taylor, Legal Aid of Western Oklahoma, Inc., Oklahoma City, for Appellant Biological Father.

Gary L. Blevins, Gary L. Blevins & Assoc. P.C., Oklahoma City, for Appellee Adoptive Parents.

JOPLIN, Judge.

The biological father (Father) of Baby Girl M. seeks review of the trial court's order finding his consent to the child's eligibility for adoption unnecessary. In this appeal, we are presented with three questions: (1) whether the Oklahoma statutes concerning adoption of children conceived by unwed fathers are unconstitutionally vague; (2) if the answer to this first question is no, then, is the decision by the trial court in this case supported by sufficient evidence; and (3) if we find the trial court's decision so supported, whether the trial court erred in allowing the adoption to proceed without further notice thereof to biological father. We here hold the Oklahoma statutory adoption scheme, under some circumstances providing an unwed, biological father with notice and opportunity to be heard on the issue of necessity for father's consent to adopt, not unconstitutionally vague, where as here, with knowledge of the impending birth of the child believed to be his, the unwed biological father is shown by clear and convincing evi-

dence to have failed to acknowledge paternity or take *any* action to legally establish his claim of paternity, or to exercise parental rights and duties with respect to the child, including failure to contribute to the support of the mother during her pregnancy. We further find the trial court's decision not against the clear weight of the evidence, and conclude the trial court did not err in proceeding with the adoption without further notice to the biological father.

This case represents the latest generation of cases involving the rights and responsibilities of unwed fathers. Prior to 1972, it was difficult, if not impossible, for an unwed father to establish *any* parental rights to his biological children. However, the United States Supreme Court in *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), "described Peter Stanley as a man who had 'sired and raised' his children[,] [a] man who had lived with and supported them all their lives ... [and] [t]he Court equated the interest of a custodial unwed father with that of any other custodial parent and gave it equal constitutional stature." *Matter of Adoption of Baby Boy D.,* 742 P.2d 1059, 1066 (Okla.1985). The U.S. Supreme Court consequently held:

> [I]f Stanley was a fit parent, removal of his children would do nothing to further the state's interest in the welfare and safety of his children. Thus, there was a necessity to disprove Stanley's fitness. As a custodial unwed father, Stanley had a constitutional interest in his relationship with his children equal to the interest of other custodial parents. His interest entitled him to a hearing on his fitness because fitness was the standard applied to state removal of children from other custodial parents. *It was his custody of his children, and not his biological connection alone, that gave him an interest of the same stature as that of any other custodial parent.*

*Baby Boy D.,* 742 P.2d at 1066. (Emphasis added.)

For the next 11 years, the U.S. Supreme Court established the principles which currently govern the rights and responsibilities of unwed fathers. The U.S. Supreme Court has found the parent-child relationship to be a constitutionally protected liberty interest entitled to due process safeguards. *See, e.g., Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). *See also, Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978). However, each Supreme Court case which has considered the *extent* of this interest, and corresponding constitutional protection thereof, has made a clear distinction between the rights of those fathers who have a "mere biological relationship" and those fathers who have meaningfully "demonstrate[d] a *full* commitment to the responsibilities of parenthood," assuming an "actual relationship of parental responsibility." *Lehr,* 463 U.S. at 259–260, 261, 103 S.Ct. at 2992–2993, 2993 (emphasis added). That is to say, the "mere existence of a biological link does not merit equivalent constitutional protection." *Lehr,* 463 U.S. at 261, 103 S.Ct. at 2993.

Consistent with this view, the Supreme Court has recognized that fathers of children conceived and born out of wedlock gain from that biological connection a constitutionally protected "opportunity" to develop a relationship with the child. *Lehr,* 463 U.S. at 262, 103 S.Ct. at 2993–2994. However, in order to avail himself of constitutional protection, the biological father must "[grasp] that opportunity." *Id.*

■ In the 1985 case of *Baby Boy D.,* the Oklahoma Supreme Court applied these cases in the constitutional analysis of the Oklahoma adoption statutes, then requiring no consent to adopt from, nor even notice of adoption proceedings to, unwed fathers, but requiring consent of mother and fathers of "legitimate" children, and consent of mothers of illegitimate children, and held the Oklahoma adoption statutes constitutional. As to both due process and equal protection concerns, the Oklahoma Supreme Court held the statutory scheme for the adoption of children born out of wedlock constitutionally sound, and that the constitution permitted omission of notice and the opportunity for the unwed father to be heard in the adoption proceedings. *Baby Boy D.,* 742 P.2d at 1068. Moreover:

> In the adoption proceeding the competing interests at stake must be balanced.

Granting unwed fathers the same rights as all other parents, but *with no guarantee that they would assume the responsibilities that other parents assume,* would be giving the unwed father an unqualified right to block an adoption, absent unfitness, even though the adoption might be in the child's best interest. The Supreme Court has been unwilling to allow unwed fathers to have the rights of parenthood without also assuming the responsibilities of parenthood. This reasoning represents a careful balancing of the competing interests at stake. We concur in that reasoning and its result. Requiring the consent to adoption of the natural mother, but not the consent of the natural father, of the child born out of wedlock in the instan(t) case does not deny appellant equal protection of the law.

*Baby Boy D.,* 742 P.2d at 1069 (emphasis added). This is consistent with the United States Supreme Court analysis in *Lehr* recognizing a "clear and significant" difference between the status of a biological father married to the mother and a father who conceives a child out of wedlock; the married father has legal rights as father from the outset, while the unmarried father does not have automatic rights as father, but must acquire such rights through his conduct. 10 O.S.1991 § 60.6(3). The latter must take some positive action to assume the *responsibilities* of parenthood before he becomes entitled to exercise the *rights* of parenthood. *See, Lehr,* 463 U.S. at 261, 103 S.Ct. at 2993. *See also, Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979).

Since *Baby Boy D.,* the Oklahoma statutory adoption scheme has developed to the point where now unwed fathers *are* given notice and opportunity to be heard, to demonstrate they have seized the parental opportunity interest, or if they have not, to show that they were otherwise prevented from exercising their parental rights, duties and obligations. If they so show, then their consent to adoption is necessary, a far cry from the law in Oklahoma just ten years ago. Today, Oklahoma's statutory adoption scheme recognizes such protected opportunity interest. That is, a child may not generally be adopted without the consent of its

parents. 10 O.S.1991 § 60.6. However, consent is not required from the father or putative father of a child born out of wedlock if:

a. prior to the hearing provided for in Section 29.1 of this title, and having actual knowledge of the birth or impending birth of the child believed to be his child, he fails to acknowledge paternity of the child or to take any action to legally establish his claim to paternity of the child or to exercise parental rights and duties over the child, including failure to contribute to the support of the *mother* of the child to the *extent* of his financial ability during her *term* of pregnancy, or

b. at the hearing provided for in Section 29.1 of this title:

(1) he fails to prove that he is the father of the child, or

(2) having established paternity, he fails to prove that he has exercised parental rights and duties toward the child unless he proves that prior to the receipt of notice he had been specifically denied knowledge of the child or denied the opportunity to exercise parental rights and duties toward the child. As used in this subparagraph, specific denial of knowledge of the child or denial of the opportunity to exercise parental rights and duties toward the child shall not include those instances where the father or putative father fails to prove to the satisfaction of the court that he has made a sufficient attempt to discover if he had fathered the child or to exercise parental rights and duties toward the child prior to the receipt of notice, ...

10 O.S.1991 60.6(3)(a), (b). Section 60.6(3) thus protects biological fathers who undertake affirmative, positive acts of parental responsibility. Section (a) clearly extends protection to biological fathers who, with knowledge of conception of a child out-of-wedlock, exercise parental rights and duties by contributing to the support of the birth mother during the term of her pregnancy, i.e., *before* the child's birth. Section (b) extends protection to biological fathers who

prove they have been denied knowledge of the child or the opportunity to exercise parental rights and duties to the child *after* the child's birth.

◼ With the law developed to this point, it was inevitable that the next generation of cases would shift the constitutional battleground from due process/equal protection issues to vagueness concerns, i.e., "how much" support is sufficient to manifest seizure of the parental opportunity interest. This quantitative analysis is fact driven, to be determined by the trier of fact in the first instance, and affirmed by the appellate courts if not against the clear weight of the evidence. *See, e.g., Webb v. Wiley,* 600 P.2d 317 (Okla.1979) (In proceeding on adoption petition in which natural mother filed application to withdraw consent to adoption, Supreme Court will not reverse trial court determination unless against clear weight of evidence.)

◼ In the present case, Biological Father submits that the Oklahoma statutory adoption scheme is unconstitutionally vague, arguing (1) that 10 O.S. § 29.1 gives no notice to *anyone* of the grounds upon which parental rights may be terminated; and (2) that 10 O.S. § 60.6(3) is unconstitutionally vague because it fails to provide guidelines for application of the criteria there listed as required to grasp the parental opportunity interest. We reject Biological Father's arguments for several reasons.

First, Biological Father acknowledges that *Baby Boy D.* provides some guidance, specifically setting out the factors to be considered. Those factors deemed sufficient to evince assertion of parental rights, responsibilities and duties have been adopted into the statutory scheme.

◼ Second, Biological Father ignores the inter-relationship between 10 O.S. § 29.1 and 10 O.S. § 60.6(3). The test for vagueness is whether the language of the subject statute is sufficiently definite to warn persons of common intelligence or understanding the conduct that person is expected to follow. *Matter of Daniel, Deborah and Leslie H.,* 591 P.2d 1175 (Okla.1979). In applying this test to the challenged statutory language, it is proper to consider the purpose of the statute, and the legitimate interest that the state is seeking to protect by the statute. *Lodes v. State ex rel. Okla. Real Estate Com'n,* 837 P.2d 925 (Okla.App.1992). While it may be conceded that the statutory provisions now considered do not detail every potential event which may arise, we find the provisions of §§ 29.1 and 60.6(3) clear enough to inform and guide ordinary persons in their conduct. Persons of ordinary intelligence know, as the courts have consistently held, that with the onset of parenthood comes responsibilities, including the provision of permanence and stability, as well as meeting the obvious physical needs. *Baby Boy D.,* 742 P.2d at 1067. The purpose of the statutes in question is not simply to protect a natural parent's fundamental right of parenthood. In the final analysis, the primary purpose and paramount objective of all the children-oriented provisions of Title 10 is the protection of the child's best interests. *In re Adoption of A.G.K.,* 728 P.2d 1, 4–5 (Okla.App.1986). Ultimately, we find the statutes in question, read in harmony, sufficiently definite to warn persons of ordinary intelligence that with the onset of parenthood comes responsibilities, and that this statute specifically and with sufficient definiteness lists the very basic requisites of accepting such responsibility as to grasp the constitutionally protected parental opportunity interest.

◼ Biological Father further argues that if he undertakes any *one* of the acts enumerated in § 60.6(3), i.e., *either* acknowledges the child as his, *or* takes legal action to establish paternity, *or* exercises parental rights, then his consent to adopt is required. However, the fundamental rules of statutory construction compel a contrary conclusion: The clause in § 60.6(3)(a), "including failure to contribute to the support of the mother to the extent of his financial ability during her term of pregnancy," must modify each preceding clause and therefore requires acknowledgment of paternity, legal action to establish same, or exercise of parental rights and duties be accompanied by support of the mother during pregnancy. Read otherwise, bare "acknowledgment" of paternity would

invoke constitutional protection of a non-existent parent/child relationship, an interest clearly not protected. *See, e.g., In the Matter of the Adoption of Baby Boy W.*, 831 P.2d 643 (Okla.1992). It is the biological father's *assumption* of parental duties which is of constitutional significance. *Doe v. Roe, In re Adoption of Doe*, 543 So.2d 741 (Fla.1989) (emphasis added).

As we have previously noted, the Oklahoma Supreme Court has previously determined that the Oklahoma adoption statutes, even without the current protections for unwed fathers, withstands constitutional challenge under due process/equal protection analysis, and we here hold the Oklahoma adoption statutes sufficiently apprise those potentially affected by the terms thereof of the conduct required in order to invoke constitutional and statutory protection of the parent-child relationship. We therefore reject Father's constitutional challenges.

■■■■■ We thus come to the heart of Biological Father's appeal challenging the sufficiency of the evidence showing his failure to assume parental rights and responsibilities or to legally establish his paternity. The determination of whether a biological father has exercised his parental rights and duties toward the child, specifically including support of the mother during pregnancy, is a question of fact. *Baby Boy W.*, 831 P.2d at 646. "[I]n a hearing to determine a child eligible for adoption without the consent of a parent[,] ... because of the nature of the rights involved the proof necessary to support the finding of eligibility must be clear and convincing." *Merrell v. Merrell,* 712 P.2d 35, 37 (Okla.1985). In this case, the trial court heard the evidence, entering detailed findings of fact and conclusions of law, and we will not reverse the trial court's conclusion of a child's eligibility for adoption without consent of the biological parent if not against the clear weight of the evidence. *Webb,* 600 P.2d at 320.

Under these standards we have reviewed the evidence. Biological Father and Mother, both high school students, began dating in the Spring of 1994. In early October 1994, Mother moved into a residence with two young men but stayed in contact with Father. On October 12, Father took Mother for a pregnancy test (for which he paid $15) which returned a positive result. Following this test, Father proposed marriage to Mother on at least two occasions, but Mother declined; Father also made a one-time conditional offer of financial assistance to Mother "if she needed it," but Mother declined this offer, too. In November, Mother stayed four nights with Father at the house of Father's mother and step-father, but Mother left because he wanted to break off the relationship. Mother thereafter returned to live with her parents while Father began, or continued, a relationship with another minor female. Although Mother ultimately stopped accepting phones calls from Father, Father and Mother spoke often and Father knew throughout the pregnancy of Mother's whereabouts.

The evidence also shows Father responded negatively to Mother's later requests for financial assistance, at times denying paternity and at other times, refusing to contribute support until he knew the child was his. Father made no inquiries regarding Mother's medical bills, or sought to assist with payment thereof. Nor did Father seek to contribute to Mother's living expenses during her pregnancy. Indeed, Father did not even attempt to support himself commensurate with his ability, putting almost all his earnings into fixing up old cars.

Mother gave birth on June 8, 1995 to Baby Girl M., the prospective adoptive parents petitioned for adoption on June 9, 1995, and Mother gave her consent to adopt on June 12, 1995. Thereafter, the prospective adoptive parents petitioned to adopt without Father's consent, and on June 19, 1995, gave Father notice of hearing thereon scheduled for July 5, 1995, but the hearing was continued until September 1995, some three months after birth of Baby Girl M. and Father's receipt of notice of the adoption proceedings. Yet, Father did *nothing* between birth of Baby Girl M., receipt of notice, and hearing to establish his paternity, to acknowledge his paternity or otherwise contribute to the child's support.

The trial court on consideration of the evidence entered specific findings, inter alia:

On October 12th, 1994, Mr. Freeman took Ms. Montgomery to Planned Parenthood. Mr. Freeman paid for a pregnancy test, and the test results were positive. The test results and the baby's due date of June 4th, 1995, were told to both Ms. Montgomery and Mr. Freeman while they were at Planned Parenthood;

Shortly after the test results and prior to Ms. Montgomery's four-night stay at Mr. Freeman's mother's home, Mr. Freeman made a one-time conditional offer of financial assistance to Ms. Montgomery stating, "if she needed it." Ms. Montgomery declined the offer;

Mr. Freeman proposed marriage to Ms. Montgomery on at least two occasions, and each such proposal was refused by Ms. Montgomery. Ms. Montgomery spent four nights with Mr. Freeman at the home of Mr. Freeman's mother in early November, 1994. Ms. Montgomery left there because Mr. Freeman told her he wanted to break off the relationship;

Mr. Freeman frequently asked Ms. Montgomery how she and the baby were doing. Mr. Freeman responded negatively to Ms. Montgomery's later requests for financial assistance, at times denying he was the father of the child, and at times stating there would be no money until he knew the child was his. Any belief of Mr. Freeman's that the child was not his is not supported by the evidence presented to the Court and would not have been a reasonable belief on his part;

Mr. Freeman worked at Taco Bueno during the summer of 1994, earning approximately $4.75 to $4.85 per hour, and working approximately 30 to 35 hours a week. He held this job through October of 1994. He did not work in November of 1994. From December 1994 into April of 1995, he worked at Pep Boys approximately 30 to 35 hours a week, earning between $5.00 and $5.50 per hour. In April, 1995, he also worked at M & L Maintenance, earning $6.00 per hour. Sometime in May, 1995, Mr. Freeman was injured in an auto accident from which he received a financial settlement. He did not return to work until June, 1995, when he went to work for Elite Security as a security guard.

Mr. Freeman never inquired of Ms. Montgomery or her mother as to what medical bills might need to be paid or sought to assist with the payment of any such bills;

Mr. Freeman never told Ms. Montgomery he wanted to keep the baby;

Mr. Freeman's financial contributions from his earnings to his living expenses during the course of the pregnancy were minimal in comparison to his income except for his expenditures on cars. Mr. Freeman enjoys working on old cars and put almost all of his earnings into fixing them up and keeping them running;

After learning of the adoption proceedings, Mr. Freeman applied for a blood test to determine whether he was the father of the child. At his deposition on August 23rd, 1995, Mr. Freeman declined to unequivocally acknowledge paternity of Baby Girl Montgomery. Mr. Freeman has not registered his paternity of Baby Girl Montgomery with the Department of Human Services. Mr. Freeman has not filed a paternity action.

The trial court then concluded as a matter of law:

The proposals of marriage by Mr. Freeman do not amount to, "any action to legally establish his claim to paternity of the child", [10 O.S.1991 § 60.6]. The "any action," language of the statute should not and will not be construed by this Court so as to allow a putative father to propose marriage to an unwilling natural mother and thus attempt to preserve his rights to the unborn child at her expense;

Ms. Montgomery's refusal of marriage is insufficient evidence of her alleged unwillingness to accept financial assistance and her alleged interference with Mr. Freeman's exercise of his parental rights and duties toward the unborn child.

Mr. Freeman's actions, having made the phone block necessary, can hardly urge the existence of the phone block as sufficient evidence that Ms. Montgomery denied him the opportunity to exercise his parental rights and duties;

If Mr. Freeman's frequent generic inquiries as to how Ms. Montgomery and the baby were doing are an exercise of parental rights and duties, they are neither quantitatively nor qualitatively sufficient to satisfy the statute;

Ms. Montgomery's four-night stay at the home of Mr. Freeman's mother fall[s] far short of "support in accordance with his ability during the course of the pregnancy";

Mr. Freeman had sufficient funds to contribute to Ms. Montgomery's expenses. His contribution to his own overhead did not prevent him from contributing to Ms. Montgomery's expenses, yet he utterly failed to do so;

Upon reflection of what is in the best interest of the child in view of the foregoing findings and conclusions, the Court also concludes that Mr. Freeman's consent to the adoption of Baby Girl Montgomery is not necessary and this adoption may proceed without his consent thereto.

 The statutory adoption scheme requires the court to determine that a biological parent has grasped or will grasp the parental opportunity interest and exercise all the rights and responsibilities commensurate therewith. It is not sufficient to announce an intent to exercise parental responsibility; rather the biological parent must in fact undertake positive affirmative acts to grasp the parental opportunity interest. The opportunity interest begins at conception, but it is not indestructible and may be lost by the biological father's failure to pursue and develop that relationship. *In re Baby Girl Eason*, 257 Ga. 292, 358 S.E.2d 459 (1987). That is, a biological father must undertake acts evincing not only a future intent but also a positive present assumption of parental duties; pronouncement of future intent is insufficient without present actual support.

 The critical time period to be used in evaluating Father's conduct began October 12, 1994, when Mother and Father learned of the conception, through the birth of the child and notice of the adoption proceedings in June 1995, up to and until hearings in September and October 1995. The parties severed the relationship in November 1994, and

Father never supported Mother during her pregnancy or thereafter to any extent, much less to the extent of his ability. *The fact that the parties no longer participated in an intimate relationship does not, and did not, relieve Biological Father of his obligation to support Mother during her pregnancy in order to avail himself of the constitutionally protected parental opportunity interest.* There is no evidence Mother denied Father the opportunity to exercise parental rights and duties toward the child; rather, the evidence clearly reflects Father made no attempt to financially support Mother even though he knew of Mother's whereabouts. Moreover, Father's own testimony indicates his ability to financially support Mother during her pregnancy. It is also uncontroverted that Father did nothing to acknowledge or establish his paternity after the birth of Baby Girl M.

Under these specific facts and circumstances, we hold the trial court did not err in finding Father's conduct insufficient to demonstrate Father exercised the requisite parental rights and duties toward the child, including contribution of support to Mother during the pregnancy—the statutory period during which the biological father must manifest his assumption of parental responsibilities. 10 O.S. § 60.6. We further hold Father presented no evidence of specific denial of opportunity to exercise these parental rights. Stated otherwise, the record supports a finding that Father failed to take sufficient action, legal or otherwise, during virtually the entire duration of Mother's pregnancy to financially support Mother, and did not assume the responsibilities and duties of a prospective parent so as to afford Father a constitutional right to unilaterally veto the child's eligibility for adoption by withholding his consent thereto. *See, In re Adoption of Baby E.A.W.,* 647 So.2d 918 (Fla.App.1994).

 Father lastly asserts the trial court erred in allowing the adoption matter to proceed without further notice to him after the trial court determined his consent unnecessary, arguing such action constitutes a de facto termination of his parental rights. We must read the statutes at issue in harmony.

**244**

See, e.g., *City of Tulsa v. Smittle*, 702 P.2d 367 (Okla.1985) (general and specific statutory provisions given "harmonious" effect). In the Oklahoma adoption scheme, the legislature has enacted a series of statutes designed to protect both biological fathers who demonstrate sufficient indicia of responsibility toward their progeny balanced against protection of the best interests of children whose biological parents do not demonstrate such responsibility. In this particular, Father apparently takes issue with the interrelationship between the different sections of Title 10 regarding adoption without consent of a biological parent and the termination of parental rights in order to effectuate such adoptions. However, we note the only relief requested by Father, and the order from which Father specifically appeals, is the trial court's finding that Father's consent to adoption was unnecessary. Clearly, the statutory scheme for adoption without consent allows the trial courts alternative methods to determine whether such consent is necessary. The parties below proceeded under the provisions of 10 O.S. § 60.6 which does not require a termination of parental rights in order to determine that a biological father's consent to adoption is unnecessary. Where an unwed father's consent is found to be unnecessary, he has no further right to contest that adoption.

Apparently in the alternative, Father argues that because the trial court, at one point, stated Father *was* entitled to further notice of the adoption proceedings, he *is* in fact entitled to notice and hearing regarding the adoption. The record reflects, though, that in its final order the trial court specifically rejected its statement regarding further notice to Father. We have reviewed the case law regarding any perceived conflict between a finding that consent to adopt is unnecessary and a termination of parental rights. In that regard, we once again affirm this State's previous decisions to the effect that although a finding of no necessity of consent does not necessarily sever parental ties, such ties must first be established and, if so, only remain intact until and unless a decree of adoption is actually entered. *See, Merrell v. Merrell*, 712 P.2d 35 (Okla.1985). In the present case, Father failed to establish a protected parental interest which would entitle him to notice and hearing of a private adoption proceeding for which his consent was unnecessary. Consequently, we find no error by the trial court in this regard.

The order of the trial court holding Father's consent to adopt unnecessary is therefore AFFIRMED.

HANSEN, P.J., dissents.

BUETTNER, J., concurs.