1998 OK CIV APP 33

**In the Matter of the ADOPTION OF G.E.E., A Minor;**

**Mark Alan PENDERGRAFT, Appellant,**

v.

**PROJECT ADOPT, INC., Appellee.**

**No. 90322.**

Court of Civil Appeals of Oklahoma, Division No. 3.

Feb. 24, 1998.

Doug Aldridge, Oklahoma City, for Appellant.

Gerald Kelley, Oklahoma City, for Appellee.

## OPINION

HANSEN, Judge.

¶1 On February 13, 1997, a child was born out of wedlock to Megan Renee Edgman (Mother). On February 14, 1997, Appellee Project Adopt applied to Oklahoma County District Court for a Temporary Order of Custody. That same day, the order was granted, and the hospital where the child was born released the child to Appellee, which, in turn, placed the child in foster care.

¶2 On February 26, 1997, Mother appeared before the trial court and executed an affidavit stating the biological father of the child is either John T. Richerson (Richerson) or Mark Alan Pendergraft (Father) and that neither possible father had acknowledged paternity or supported her during her pregnancy. The same day Mother and Richerson relinquished their parental rights to the child.

¶3 On February 28, 1997, Appellee filed an Application for Adoption Without the Consent of the Natural Father, and/or Order Determining Natural Father has no Parental Rights, and/or Order Terminating Parental Rights. A Notice of Hearing was issued to Father. Father filed an Objection to Adoption Without Consent of Putative Father. Therein he stated it "is possible that Mark Alan Pendergraft is the natural father of said child, in that he has on several occasions had sexual intercourse with the mother of said child, Megan Edgman, particularly at the time of the probable conception of the child." He further requested a stay of proceedings until he could submit to DNA testing to determine whether he is the biological father of the child. The trial court set a hearing date and appointed counsel for the child and counsel for Mother. The DNA test results revealed Father to be the biological father of the child. The four day trial occurred over a space of three months, on July 2 and 3, August 18, and September 16, 1997.

¶4 In its Journal Entry of Judgment, the trial court found Mother informed Father of her pregnancy on June 21, 1996, and that same day told him he was the father of the unborn child. It also found Father failed to register with the Central Paternity Registry of the State of Oklahoma, and he failed to file any legal actions to establish his paternity rights. It further found Father did not tender to Mother, or any person on her behalf, any support of any kind during her pregnancy. The trial court also found Father wholly failed by his acts and deeds to take any positive affirmative action to acquire his lawful opportunity to pursue and develop a paternal relationship with the child.

¶5 The trial court then held because Father failed to present sufficient proof of his

providing support to Mother during her pregnancy, or failed to pursue his legal remedies to establish his parental rights, no such parental rights were acquired or established by Father. Thus, his consent was not necessary or required for the adoption of the child to proceed. The trial court then ordered that the child may be placed for adoption without Father's consent. Father appeals.[1]

■ ¶ 6 For his first proposition of error, Father contends "the trial court erred in finding Appellant [Father] had actual knowledge of the impending birth of his child." 10 O.S.1997 Supp. § 60.6(3) provides that a child under eighteen years of age cannot be adopted without the consent of its parents, if living, except that consent is not required from:

. . . .

3. The father or putative father of a child born out of wedlock if:

a. Prior to the hearing provided for in Section 29.1 of this title, and having actual knowledge of the birth or impending birth of the child believed to be his child, he fails to acknowledge paternity of the child or to take any action to legally establish his claim to paternity of the child or to exercise parental rights or duties over the child, including failure to contribute to the support of the mother of the child to the extent of his financial ability during her term of pregnancy, or

b. at the hearing provided for in Section 29.1 of this title:

. . . .

(2) having established paternity, he fails to prove that he has exercised parental rights and duties toward the child unless he proves that prior to the receipt of notice he had been specifically denied knowledge of the child or denied the opportunity to exercise parental rights and duties toward the child. As used in this subparagraph, specific denial of knowledge of the child or denial of the opportunity to exercise parental rights and duties toward the child shall

not include those instances where the father or putative father fails to prove to the satisfaction of the court that he made a sufficient attempt to discover if he had fathered the child or to exercise parental rights and duties toward the child prior to the receipt of notice . . . .

Father claims this statute "contemplates a condition prerequisite to the responsibilities imposed upon the father of a child born out of wedlock. He must have actual knowledge that he is the father of the child . . . . Consequently, with the precedent condition unsatisfied, the responsibilities of support were never invoked." We disagree. Section 60.6(3)(a) provides the putative father must have actual knowledge of the impending birth of the child "believed to be his child." Certainly, since June 21, 1996, Father had actual knowledge of the impending birth of the child.

¶ 7 Did Father believe the child to be his child? The record reveals Mother was uncertain about paternity inasmuch as she had sexual intercourse with Richerson on May 3, 1996, had a menstrual period or "spotting" beginning May 12, 1996, and then had sexual intercourse with Father on May 29, 1996. Mother's obstetrician testified it was entirely possible for Mother not to have known whether she was pregnant by Richerson or Father based upon these facts. The initial due date of February 26, 1997, for the child's birth was based on the use of May 12, 1996 as the first day of Mother's last menstrual period and also on the obstetrician's use of a "conception wheel." The second due date of February 15, 1997, was based on an ultrasound of the fetus. A second ultrasound during Mother's pregnancy revealed a due date of February 6, 1997. The obstetrician testified the estimated due date which comes about as a result of the first ultrasound is usually considered the most accurate. He also testified 85% of women will deliver within two weeks on either side of their first ultrasound due date and 15% of women will deliver more than two weeks on either side of the first ultrasound due date. Thus, he testified it was not possible to know for certain

---

1. Over objection of Father, Appellee's amended answer brief, filed February 4, 1998, is accepted and Appellee's answer brief, filed December 30, 1997, is stricken.

whether Richerson or Father was father of the child.

¶ 8 In his brief-in-chief, Father states that he, "just like the mother, didn't know who the father was until the DNA test results came back." Because she was afraid of Father and because she was continuing her relationship with Richerson, Mother told Father as her pregnancy progressed that he was not the child's biological father. Yet, the record reveals he continued to believe he was either the father or possibly the father.

¶ 9 Section 60.6(3)(a) provides that consent to adoption is not required from "the father or putative father of a child born out of wedlock...." The statute uses both terms "father" and "putative father" to indicate the duty to support a woman during the term of her pregnancy falls upon not only those men who know they are the father, but also upon men who are putative fathers. By including the term "putative father," the statute takes into account there may be more than one possible father. Despite this fact, the man who ultimately is proved to be the father is under the duty to support the mother to the extent of his financial ability during the term of her pregnancy. The "knowledge" required is knowledge of the child's conception, not knowledge of definitive paternity. Father knew Mother was pregnant with a child he believed could possibly be his. Father did not financially support Mother during her pregnancy.[2]

¶ 10 Father also contends "the trial court erred by not finding [he] was induced by the fraud of the mother to compromise his rights to the child." We do not agree. The trial court had disputed evidence from which it could decide that no fraud occurred.

¶ 11 An appellate court will not reverse the trial court's conclusion of a child's eligibility for adoption without the consent of the biological parent if that conclusion is not against the clear weight of the evidence. *Matter of Adoption of Baby Girl M.*, 942

P.2d 235 (Okla.Civ.App.1997). Herein, the trial court, having observed the demeanor of the witnesses, is to be accorded wide discretion in determining their credibility. The trial court's conclusion the child herein is eligible for adoption without Father's consent is based upon factual determinations which are not against the clear weight of the evidence.

AFFIRMED.

BUETTNER, P.J., and ADAMS, J., concur.

---

2. There was no evidence Father was denied "the opportunity to exercise parental rights and duties toward the child ... " during Mother's pregnancy. Section 60.6(3)(b)(2). "It is not sufficient to announce an intent to exercise parental responsibilities; rather the biological parent must in fact undertake positive affirmative acts to grasp the parental opportunity interest. The opportunity interest begins at conception...." *Matter of Adoption of Baby Girl M.*, 1997 OK CIV APP 33, 942 P.2d 235.