2011 OK CIV APP 12

**In the Matter of the ADOPTION OF L.D.B.,**

**Chad Gottfried, Appellant,**

v.

**Crisis Pregnancy Outreach, Inc., Appellee.**

**No. 107838.**

Court of Civil Appeals of Oklahoma, Division No. 1.

Oct. 1, 2010.

Phillip P. Owens, Chris Harper, Inc., Edmond, OK, for Appellant.

Michael E. Yeksavich, Tulsa, OK, for Appellee.

Kelly M. Greenough, Assistant Public Defender, Tulsa County, Tulsa, OK, for L.D.B.[1]

1. Counsel for L.D.B. waived the right to file an appellate brief, advising the Court: "Appellant

WM. C. HETHERINGTON, JR., Judge.

¶1 Chad Gottfried (Father) appeals an order granting a petition by Crisis Pregnancy Outreach, Inc. (C.P.O.) pursuant to 10 O.S.2001 § 7505–2.1 [2] to terminate his parental rights to L.D.B. and to allow adoption of the child without his consent pursuant to grounds stated in 10 O.S.2001 § 7505–4.2. The trial court's order finding Father failed to provide Jamye Beasley (Mother) with support during her pregnancy, had not proven his defenses, and the child was eligible for adoption without his consent is AFFIRMED. Having so concluded, additional issues relating to the adoption of the child in Arkansas need not be addressed.

¶2 On September 26, 2006, C.P.O. filed a petition to terminate Father's parental rights to L.D.B. pursuant to 10 O.S.Supp.2007 § 7505–4.2(C)(1), which provides that consent to adoption is not required for a child born out of wedlock if:

> The minor is placed for adoption within ninety (90) days of birth, and the father or putative father fails to show he has exercised parental rights or duties towards the minor, including, but not limited to, failure to contribute to the support of the mother of the child to the extent of his financial ability during her term of pregnancy.

Mother signed a Permanent Relinquishment for Adoption relinquishing her parental rights in favor of C.P.O. on September 27, 2006, and an order terminating her parental rights and placing the child's custody with C.P.O. was filed that same day.

¶3 Father was sent notice of a scheduled October 27, 2006 hearing to determine whether his parental rights should be terminated. After several continuances, a hearing began on July 9, 2007, but during the proceedings it appeared that an agreement had been reached for termination of Father's parental rights, and the trial judge questioned Father about his understanding regarding the agreement for parental rights termination.

¶4 On July 20, 2007, Father filed a revocation of his consent to adoption and termination of his parental rights. On July 31, 2007, C.P.O. moved to dismiss the revocation and the trial court granted the motion. An order terminating Father's parental rights and declaring the child eligible for adoption was filed August 3, 2007. Father appealed, arguing the order terminating his rights lacked required findings and it failed to meet other requirements. The Oklahoma Court of Civil Appeals reversed the termination of Father's parental rights on August 20, 2008, found the trial court had erred as a matter of law, remanded the matter to the trial court, and the reversal proceeded to mandate.

¶5 On February 2, 2009, C.P.O. filed a Special Appearance and Motion to Dismiss which argued Father knew of the Arkansas adoption proceedings, he had taken no action regarding those proceedings, and he had filed a motion in Oklahoma to set visitation and for D.N.A. testing. The trial court denied C.P.O.'s motion to dismiss, denied Father's visitation motion, and set the matter for pre-trial conference on the issue of termination of Father's parental rights. C.P.O. filed an Application to Assume Original Jurisdiction and Petition for Writs of Prohibition and Mandamus with the Oklahoma Supreme Court, arguing any remedy for Father lies with the Arkansas courts. The application and petition were denied on June 29, 2009.

and Appellee's briefs adequately advance the parties' respective arguments as to whether clear and convincing evidence supports the trial court's decision and there is no alternative argument or third position to be articulated on behalf of the minor child."

**2.** Pursuant to 10 O.S.Supp.2006 § 7505–2.1(A)(1), a "child placing agency" to whom a parent has relinquished parental rights to a child born out of wedlock may petition for termination of the parental rights of a putative father or parent of the child, and the trial court may terminate parental rights if in the best interest of the child "upon any of the grounds provided in Section 7505–4.2 of this title for declaring consent unnecessary." 10 O.S.Supp.2006 § 7505–2.1(D)(2). The hearing in this matter was not conducted pursuant to 10 O.S.2001 § 7505–4.1, and, consequently the analysis of the disjunctive provisions found in subsection C of § 7505–4.1 in *In re A.N.K.*, 2000 OK CIV APP 94, 55 P.3d 1093, and that statute's impact upon the permissible findings of the trial court do not apply here.

¶ 6 The case proceeded to trial on August 26 and 27, 2009. The trial court found the child has been placed for adoption within ninety days of birth and there was clear and convincing evidence Father had "failed to provide any support, financial or otherwise, to [Mother] during her pregnancy with the minor child," and he had "*not* made sufficient efforts, to the Court's satisfaction, to exercise parental duties and responsibilities." (Emphasis in original.) The trial court "specifically" found that "making a few telephone calls to locate [Mother] and making no attempts to provide financial support or any other kind of support" were insufficient to exercise parental rights and duties prior to receipt of notice to terminate parental rights. In light of his failure to take legal action to establish parental rights and duties before receiving notice of the action to terminate his rights, the trial court denied his claim under 10 O.S.2001 § 7505–4.2(D) that he was denied the opportunity to exercise parental rights and responsibilities. The trial court found there was "clear and convincing evidence [Father] made few and small efforts to determine if he had fathered the minor child." The trial court found it was in the child's best interest that Father's parental rights be terminated, the child was declared eligible for adoption, and C.P.O. was authorized to place the child and to consent to L.D.B.'s adoption.

### STANDARD OF REVIEW

¶ 7 A parent's right to the care, custody, companionship and management of her child is a fundamental right protected by both the federal and state constitutions. *Matter of Adoption of V.A.J.*, 1983 OK 23, ¶ 6, 660 P.2d 139, 141; *Matter of Adoption of Darren Todd H.*, 1980 OK 119, ¶ 18, 615 P.2d 287, 290 (overruled on other grounds). "The law presumes that consent of a child's natural parents is necessary before an adoption may be effected." *Matter of Adoption of R.R.R.*, 1988 OK 109, ¶ 6, 763 P.2d 94.

¶ 8 As recognized in *In re Adoption of O.L.P.*, 2002 OK CIV APP 17, ¶ 14–15, 41 P.3d 999, 1001–1002:

However, where a natural parent fails to demonstrate a full commitment to the responsibilities of parenthood, the state is not constitutionally or statutorily compelled to heed the parent's objections to the adoption of his or her child. *In re Adoption of Zschach* [75 Ohio St.3d 648], 665 N.E.2d 1070, 1073 (Ohio 1996); *Lehr v. Robertson*, 463 U.S. 248, 262, 103 S.Ct. 2985, 2993–2994, 77 L.Ed.2d 614 (1983). By § 7505–4.2, the Oklahoma legislature has statutorily defined specific instances of a natural parent's failure to exercise the rights and obligations of parenthood as sufficient to dispense with the parent's consent to the adoption of his or her child. (Footnotes omitted.)

The appellate courts will examine the record to determine if the trial court's conclusion a child's eligibility for adoption without the consent of the biological parent "is supported by the clear weight of the requisite clear and convincing evidence." *In re Adoption of C.R.B.*, 1999 OK CIV APP 104, ¶ 5, 990 P.2d 316, 318. "The burden is on the party seeking to adopt without consent to prove such adoption is warranted by clear and convincing evidence. Accordingly, the decision of the trial court will not be disturbed unless it fails to rest on clear and convincing evidence." *In re Adoption of C.D.M.*, 2001 OK 103, ¶ 13, 39 P.3d 802, 807. (Footnotes omitted.) The trial court "having observed the demeanor of the witnesses, is to be accorded wide discretion in determining their credibility." *In the Matter of Adoption of G.E.E.*, 1998 OK CIV APP 33, ¶ 11, 956 P.2d 942, 945. With these standards in mind, we review the record.

### THE APPEAL

¶ 9 Father argues the trial court's judgment is not supported by clear and convincing evidence and he proved a defense under § 7505–4.2(D), which provides:

In any case where a father or putative father of a minor born out of wedlock claims that, prior to the receipt of notice of the hearing provided for in Sections 7505–2.1 and 7505–4.1 of this title, he had been specifically denied knowledge of the minor or denied the opportunity to exercise parental rights and duties toward the minor, such father or putative father must prove

to the satisfaction of the court that he made sufficient attempts to discover if he had fathered a minor or made sufficient attempts to exercise parental rights and duties toward the minor prior to the receipt of notice.

Father claims Mother's whereabouts were concealed and this concealment denied him an opportunity to exercise his parental rights and responsibilities. The critical time period for evaluating Father's conduct begins when he learned of Mother's pregnancy, extends through the birth of the child, and ends when he received notice of the October 27, 2006 hearing provided for in 10 O.S.2001 § 7505–4.1.

### THE FACTS

¶ 10 Beginning in the fall of 2005, Father and Mother cohabited for several months and they engaged in sexual relations. They did not marry. Their relationship ended on January 4, 2006.[3] In the months prior to the end of the relationship, Mother, at the urging of Father or his family members, had taken pregnancy tests which were negative. When the relationship ended, Mother did not know she was pregnant. According to Father, he ended the relationship and told Mother to leave. Father's friend gave Mother a ride to Stillwater, Oklahoma when she left, but he did not ask where she went. Mother moved to a shelter in Stillwater and had a positive pregnancy test at the county health department in mid–January of 2006. She immediately shared this information with her mother, and her friend Andrea Clark. Mother claims she also tried to contact Father at that time, but he was not available at the telephone number she had for him.

¶ 11 About three weeks later, in February, Mother had Clark relay a message to Father through his mother, Cheryl Gottfried (Gottfried), that she wanted to call him. Gottfried obtained a telephone number for Father, gave Clark the number, and Mother called him while she was in a car with her then-fiancé, David Cornelius (Cornelius). She told Father she was pregnant during the conversation which occurred over a speaker phone.[4] Mother claimed she asked Father for financial assistance but he stated he did not believe the child was his and he refused to help.

¶ 12 Cornelius claimed Mother asked Father for "support for like doctors" and he responded that the child wasn't his. According to Cornelius, there was "a lot of names, a lot of arguing, fighting, enough to where it made [Mother] upset," and Father said he did not want anything to do with Mother in the future. Father claimed she asked for nothing but threatened that he would not be able to have anything to do with the child but would have to pay child support.[5] Father and Cornelius each accused the other of making threats of physical violence during this conversation. Father did not request proof of pregnancy by testing or receipt of any reports.

¶ 13 Prior to May of 2006, Father "didn't see no reason" to try to locate Mother, but thereafter he asked Gottfried and his sister to try to find Mother so he could talk to her. He testified that he was not going to help Mother unless he talked to her. He heard rumors Mother was pregnant but did not try to locate her at any time during February, March, or April of 2006.

¶ 14 In April of 2006 Mother offered to allow a friend of her mother's, Dawn McDonough (McDonough), and the friend's husband to adopt her unborn baby. Mother moved to where the couple lived in Connecticut. The arrangement did not work out.

---

3. Father claimed he moved in with his parents about two months after he and Mother's cohabitation ended and he continued to live on their property through the time of trial.

4. Father placed the time of this call in May, shortly before Dawn McDonough, a friend of Father's mother, called him to ask if he would consent to an adoption. Mother and Cornelius placed time of the telephone call on a Super Bowl weekend.

5. According to Mother, she had then planned on keeping the child. Mother and Cornelius's mother, Robin Lynch, recounted that in February of 2006, after Mother and Cornelius had talked to Father, Gottfried called Mother while Mother was visiting at Lynch's home and "started screaming at" Mother loud enough for Lynch to overhear that Mother should not call Father's family or ask for money because they did not think he was the baby's father. Gottfried denied making such a telephone call.

¶15 Father did not believe Mother was pregnant until May of 2006, when he received a morning telephone call from McDonough, who asked him if he would consent to an adoption. McDonough called again later that same day in early May and advised him Mother had been living with her in Connecticut but was returning by plane to Tulsa, Oklahoma and gave him the date and time for arrival. Father claimed he did not meet Mother at the airport because he lacked transportation. Shortly thereafter, McDonough sent him a copy of an ultrasound which had been taken in Stillwater in mid-April. Once he received the ultrasound, Father believed Mother was pregnant, but until he saw a picture of the child taken later, at age nine months of age, he continued to doubt if the child was his child.

¶16 Mother moved into a house run by C.P.O. in late June.[6] Father called C.P.O. once in June or July of 2006, but the facility did not confirm her presence. Cheryl Bauman (Bauman), founder and director of C.P.O., described that C.P.O. had a policy that residents were not to divulge their physical location because some of them formerly had been in abusive relationships. Residents also were instructed not to have relationships with males while at C.P.O.'s facilities.

¶17 In July of 2006, Bauman received a two or three-minute telephone call from Father. He wanted to know if Mother was in C.P.O.'s program. She told him she was not "at liberty" to give out the information. In her experience, birth fathers follow up, but Father did not do so. If he had, by an additional telephone call or a letter, Bauman said she probably would have asked him if he wanted to set up a meeting with Mother. Gottfried also called once during July. During a ten-minute conversation with Bauman, Gottfried requested the same information as Father had, asked where Mother was, and she received the same answer. During the two conversations neither Father nor Gottfried offered to assist Mother in any way if she was in C.P.O.'s program. Bauman passed on messages for C.P.O. residents and delivered mail sent to the organization's post office box. Mother received mail from her own family and from a school she was attending while she was at C.P.O.

¶18 Mother's Grandmother, Gloria Saar, claimed she spoke with Gottfried twice, once in June and once in late June or July. During those conversations, she confirmed Mother was pregnant but declined to reveal Mother's physical location due to C.P.O.'s rules. She gave Mother a message to call Gottfried. According to Saar, Father did not contact her directly[7] at any time between February and when Mother went to Connecticut, or after Mother returned from Connecticut and before the child was born on September 18, 2006.

¶19 Gottfried and her daughter "used a little bit of trickery"[8] to get a telephone number for Mother from Saar. From that information, Gottfried concluded Mother was at C.P.O. and so informed Father. Gottfried identified the purpose of her telephone calls as "so they could talk about the plans together about the baby." Gottfried called C.P.O. once in July and Mother received a message from her that Father wanted to talk to her. Mother testified she did not return the call to Father due to C.P.O.'s rules and did not want to talk to Gottfried because she did not get along with Gottfried, who, she claimed, had told her she was unfit and that his family was going to take her baby away when it was born. Gottfried and her daughter each called C.P.O. several times, but C.P.O. did not give them any information about Mother.[9]

¶20 Father admitted he did not try to look for Mother until after May 17, 2006. He

6. Mother continued to live at one of C.P.O.'s facilities until November of 2007, over a year after the child's birth.

7. The only evidence Father and Saar spoke by telephone was about their contact in 2005.

8. Gottfried recounted how her daughter, while in her presence, called Saar and pretended to be someone else who was trying to contact Mother, and how, after some hesitation, Saar gave them C.P.O.'s telephone number.

9. Gottfried learned of the child's birth when C.P.O.'s counsel sent paperwork for Father to relinquish his parental rights. Father did not sign those papers.

agreed he had money available to him which he could have used to assist Mother.[10] He also agreed he had not given her any support, but claimed he did not do so because he "couldn't find her" and that he would *not* help her unless he could talk to her. He had looked up Saar's telephone number[11] but also asserted he did not know her address.[12]

¶ 21 Father claimed he asked his mother and sister to search for Mother so he could talk to her because he "was always working." In 2006, he sometimes worked seven days a week for his uncle installing pools, but he also admitted the work for his uncle varied due to weather and "sometimes I'd just work two days" in a week.[13] He held another job during 2006 when his uncle was busy with other work, and in that job he worked five days a week at $9.00 an hour for eight hours a day. He also did odd jobs for his father on his days off.

¶ 22 After May of 2006, McDonough communicated "well over 50" times with Gottfried and six to eight times with Saar and Beasley. She learned from Beasley that Mother was "in a safe house or battered women's shelter" and was asked not to say anything about it. She called C.P.O. once but was not able to get any information. McDonough left a message for Mother to call her, but did not receive a response.

¶ 23 Father did not try to send mail to Mother through her family. He did not send money or any financial assistance through Mother's family because he did not know if they would provide it to her or use it for her expenses.

¶ 24 During 2006, Father communicated by mail with an imprisoned uncle but it did not occur to him to write to Mother. He did not send her any mail or financial assistance once he learned Mother was at a C.P.O. facility and did not make any offer of financial assistance when he spoke to Bauman because he felt it "was no one else's business." Gottfried obtained C.P.O.'s mailing address from its internet site. Although she asserts she was trying to help find Mother, she did not write Mother or urge Father to do so, either at C.P.O. or her relatives' addresses.

¶ 25 Father never inquired from anyone about Mother's condition or who her medical providers were, nor did he try to find out about any of Mother's medical bills.[14] He thought the identity of Mother's doctor "ain't none of my business." He did not sign an acknowledgment of paternity after L.D.B. was born[15] and did not open any bank accounts to set aside funds for the child's support.

¶ 26 Father claims he purchased items for the child after he believed Mother was, in fact, pregnant, *i.e.,* in May of 2006[16] or thereafter. However he presented no evidence he offered the items to Mother or communicated in any way to her their existence. He did not communicate any offers to pay any expenses to Mother, C.P.O., or any of Mother's medical providers. He claimed to have made such an offer to Gottfried and his sister, but did not know if his offer was

---

10. He also claimed he did not earn enough to file income tax returns.

11. Saar, who Mother previously lived with for ten years, had worked as a middle school teacher in Stillwater, Oklahoma for 26 years and McDonough had been one of her students. She testified she had been listed in the telephone book for Stillwater, Oklahoma for 26 years and Mother's mother, Reda Beasley (Beasley), had been listed there for about 16 years. The 2005 Stillwater telephone book, which lists the addresses and telephone numbers for Saar and Beasley, was admitted as a trial exhibit.

12. McDonough testified she gave Saar and Beasley's addresses to Father's family after she had told them Mother was leaving Connecticut and returning home.

13. Father testified he was paid $50 for a half day of work and $100 for a full day.

14. According to Mother, she encountered problems during her pregnancy and required treatment for potential miscarriages, RH incompatibility, and suspected stroke.

15. Father filed a paternity action on July 25, 2007, some ten months after the child's birth. However, his support during Mother's pregnancy was the sole issue in dispute at hearing.

16. His testimony he purchased items in May was impeached by prior inconsistent testimony in which he stated he did not buy anything until after the child's birth in September and he never offered to provide any of the items to Mother.

communicated to anyone else. All his attempts and those taken on his behalf were focused on talking to Mother, not offering her assistance.

¶ 27 Mere inquiries not amounting to an offer of support are not sufficient. *In the Matter of Adoption of E.S.P.*, 1978 OK 100, 584 P.2d 209. As in *Matter of Adoption of Darren Todd H.*: "The record shows without contradiction that here no payments were ever tendered and no genuine offers made." 1980 OK 119, ¶ 5, 615 P.2d at 288.

■ ¶ 28 Father was clearly informed of Mother's pregnancy the month after she conceived, but he doubted her veracity. Unlike when she was suspected of being pregnant in the past, he took no steps during the requisite time period prior to hearing to discover if he had fathered a child. Even after he purportedly believed she was pregnant in May of 2006, he took no positive steps to communicate beyond his immediate family even a desire to provide any financial support for Mother during her pregnancy, and took no legal action to establish or refute paternity prior to the child's birth. His only attempts were to locate Mother so he could "talk" to her, and he affirmatively made her compliance with his demand for communication a prerequisite to his assumption of his parental duties. He delegated his "search" to others, and though claiming the financial ability, failed to take a single step towards providing financial assistance for the child, including not only failing to even discover what medical bills were being incurred but expressed "ain't none of my business."

¶ 29 As recognized in *In the Matter of the Adoption of Baby Girl M.*, 1997 OK CIV APP 33, ¶ 21, 942 P.2d 235, 243:

The statutory adoption scheme requires the court to determine that a biological parent has grasped or will grasp the parental opportunity interest and exercise all the rights and responsibilities commensurate therewith. It is not sufficient to announce an intent to exercise parental responsibility; rather the biological parent must in fact undertake positive affirmative acts to grasp the parental opportunity interest. The opportunity interest begins at conception, but it is not indestructible and may be lost by the biological father's failure to pursue and develop that relationship. *In re Baby Girl Eason* [257 Ga. 292], 358 S.E.2d 459 (Ga.1987). That is, a biological father must undertake acts evincing not only a future intent but also a positive present assumption of parental duties; pronouncement of future intent is insufficient without present actual support.

A putative father must act and "prove to the satisfaction of the court" that "he made sufficient attempts to discover if he had fathered a minor or made sufficient attempts to exercise parental rights and duties toward the minor prior to receipt of notice" of hearing on the issue of adoption without consent but he was prevented from doing so. § 7505-4.2(D). Father's initial disbelief about Mother's claim she was pregnant was due to previous pregnancy claims being proven false. However, he took no action following her claim of pregnancy in February, and his disbelief clearly ceased to be justified by April or May of 2006, when he admits he knew her current claim of pregnancy was true.

¶ 30 Having doubts whether he was *in fact* the father of Mother's unborn child is not a defense to a failure to support. Referencing 10 O.S. Supp.1997 § 60.6(3)(a), (later was renumbered as § 7505–4.2), the Court in *In the Matter of Adoption of G.E.E.*, 1998 OK CIV APP 33, ¶ 9, 956 P.2d 942, 945, observed that the statute used both "father" *and "putative father"* when describing how the duty to support a woman during the term of her pregnancy "falls not upon only those men who know they are the father, but also upon men who are putative fathers.... The 'knowledge' required is knowledge of the child's conception, not knowledge of definitive paternity." Like in *G.E.E.*, Father knew Mother was pregnant with a child which could be his. That knowledge was present by at least May of 2006. In addition, he and members of his family had heard "rumors" she was pregnant well prior to that time, and Mother had explicitly told him of her pregnancy in February. Mother and Father's sexual activity pre-dated the end of their cohabitation, and the child was born slightly more than nine months later. Mother's residency at C.P.O., and the commencement of

the period when direct telephonic contact was not available, did not begin until late June. Other methods of contacting Mother remained open, but he failed to avail himself of any means other than telephonic communication. As the trial court found, efforts to locate her were "few and small."

¶ 31 There is clear and convincing evidence supporting the trial court's findings Father only attempted to locate Mother so he could talk to her, he knew or could easily have found addresses for Mother but he did not do so, he took no affirmative steps between April and September of 2006 "to grasp his parental opportunity interest and/or to exercise parental rights and duties as to the minor child," no support was provided to Mother during her pregnancy, and he made no effort to determine if he had fathered the child, what hospital the child might be born at, or if Mother needed assistance for clothing, food, medicine, housing, or transportation during her pregnancy. Clear and convincing evidence supports the trial court's finding that making a few telephone calls to locate Mother "and making no attempts to provide financial support or any other kind of support [were] not sufficient to the satisfaction of [the trial court] to prove sufficient attempts to exercise parental rights and duties" prior to his receipt of notice of the proceedings to terminate his parental rights. Clear and convincing evidence also supports the denial of Father's § 7505–4.2(D) claim he was denied an opportunity to exercise parental rights and responsibilities and that his consent to an adoption of the child is not required. We conclude the factual determinations of the trial court are not against the clear and convincing weight of the evidence and **affirm** the finding consent was not required.

¶ 32 Lastly, we note C.P.O. placed the child within 90 days of birth with a couple from Arkansas whom Mother selected. The adoptive family filed a petition for adoption of the child in Arkansas on July 26, 2007, an Oklahoma order terminating Father's parental rights and finding the child eligible for adoption was filed August 3, 2007, and the court in Arkansas granted the petition for adoption on November 13, 2007. C.P.O. argues Father's claims are a collateral attack upon the Arkansas decree of adoption, his claims are time-barred under Arkansas law, and the Arkansas decree should be accorded full faith and credit. At the time of the Arkansas proceedings, the child's eligibility for adoption was on appeal. However, "the pendency of an appeal shall not suspend the order of the district court regarding a minor . . . unless the Supreme Court shall so order." 10 O.S.2001 § 7505–2.1(J). Father makes no claim he moved to stay the effectiveness of the trial court's August 3, 2007 Order while his appeal was pending.

¶ 33 Father argues the Arkansas petition is not entitled to full faith and credit and he is not barred by a one-year Arkansas statute of limitations, Ark.Stat.Ann. § 9–9–216, from challenging the Arkansas adoption. He argues he did not receive proper notice of the Arkansas proceedings and was not given information about where in that state the adoption proceedings were occurring until after expiration of the limitations period. In support of his claim based upon lack of notice, he cites *McKinney v. Ivey*, 287 Ark. 300, 302–303, 698 S.W.2d 506, 508 (Ark.1985), and quotes text from that case, based on *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (U.S.N.Y.1983), holding "that the protection afforded an unwed father under the due process clause is linked to the measure of responsibility he has accepted" and "a full commitment to the responsibilities of parenthood acquires substantial protection under the due process clause." Under the evidence here, no such assumption or commitment were shown by Father. *McKinney* also is factually distinguishable in that the Court specifically found "[i]n the case at bar the appellant acknowledged his parenthood and contributed to the child's support to the extent that he was directed by the court to do so," 287 Ark. at 303, 698 S.W.2d at 508, circumstances not present here.

¶ 34 Having concluded clear and convincing evidence supports the trial court's findings Father failed to contribute to Mother's support during her pregnancy and his rather token efforts to locate her failed to establish his claimed defense, we also find persuasive other analysis in *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (U.S.N.Y. 1983), in which the Court found a putative father who had failed to establish a substan-

tial relationship with his child was not denied due process or equal protection by a lack of notice of adoption proceedings where he had failed to take the simple step of mailing a postcard to a putative father registry pursuant to state law, a step completely in his control which would have guaranteed he would receive notice. Here, not only had Father failed to embrace the parental responsibilities due his unborn child, he also failed to pursue any available legal remedies. With the affirmance of the trial court's order finding Father's consent was not necessary, we need not reach the issue of notice regarding the Arkansas proceedings [17] because a determination will not result in any remedy for Father. The legal effectiveness of the Arkansas adoption, time limitations, and full faith and credit are not issues we need address in this appeal.

**AFFIRMED**

BUETTNER, P.J., and HANSEN, J., concur.

17. Severance of the paternal bond is effected either with a final decree of adoption or by a finding termination of parental rights is in a child's best interest. Adoption proceedings here occurred solely in Arkansas, not in Oklahoma. Affirmance here extends only to the finding the child is eligible for adoption without Father's consent. The improper combination in this order of the finding of eligibility for adoption with a finding Father's parental rights should be terminated. *See In re A.N.K.,* 2000 OK CIV APP 94, 55 P.3d 1093, is not raised as a basis for reversal and therefore is not addressed. Had the issue been raised, *In re A.N.K.* presents a persuasive potential outcome.